DUCKWALL, Ex'x, et al. v.
LAWSON et al.

No. 31807.  June 11, 1946.

Rehearing Denied July 9, 1946.

Application for Leave to File Second Petition for Rehearing Denied Sept. 24, 1946.

*172 P. 2d 415.*

Bailey & Hammerly, of Chickasha, for plaintiffs in error.

Melton, McElroy & Vaughn, of Chickasha, for defendants in error.

DAVISON, J. This appeal involves a contest of the will of one T. L. Lawson, who died in Grady county, Okla., on November 10, 1940, at the age of 69 years.

At the time of his death the testator owned four farms containing 970 acres, including his 160-acre homestead near Alex, Okla., and personal property which included bank deposits of more than $21,000. He had been married twice and left four surviving children by a first wife, who died many years ago, and ten by his widow, Mary Francis Lawson.

According to the undisputed evidence, the testator accumulated all of his land after his marriage to Mary Francis, and prior to 1934 or 1935 was considered a good farmer and business man. About that time, however, be became addicted to the habitual use of liquor and to associating with other women. Then his wife left him, taking their youngest children with her, and filed suit for divorce, but later dismissed it and returned to him. Then after further proceedings unnecessary to describe herein, Mrs. Lawson obtained a decree for separate maintenance and support in 1939.

In 1940 the testator destroyed a previously executed will and on February 14th of that year executed the one involved herein. By the terms of this will Mary Francis Lawson was left only the homestead, and her children by the testator only $50 each, while testator's four children by his first wife were left all the rest and residue of his estate, and one of these, Mrs. Duckwall, was nominated executrix without bond.

In October, 1940, Mrs. Lawson filed

a petition to have the testator declared an incompetent, but no hearing was ever had thereon.

A few days after Lawson's death in November, Mrs. Duckwall instituted these proceedings by filing her petition in the county court of Grady county asking that the above described will be admitted to probate and that she be appointed executrix of the testator's estate. Thereafter a petition to contest probate of said will was filed on behalf of the testator's ten children by Mary Francis Lawson, alleging among other things, Lawson's testamentary incapacity. After said testator's other three children by his first wife had joined Eva Duckwall as proponents of the will, the county court, upon a hearing of the matter, determined the issues in favor of the proponents, admitting the will to probate and appointing Mrs. Duckwall executrix. Upon appeal to the district court, said court, after a trial de novo, reversed the judgment of the county court, holding the will null and void on account of Lawson's testamentary incapacity. From said judgment, the proponents have perfected this appeal as plaintiffs in error. They and the defendants in error will hereinafter be referred to by their original designations of proponents and contestants.

The only question presented herein is whether or not T. L. Lawson was capable of executing a valid will on February 14, 1940, the date thereof. Unless it is clearly against the weight of the evidence on this issue, the trial court's judgment cannot be reversed under the rule of appellate review in such cases.

In their argument for reversal, proponents concede that at the time of his execution of the will in question the testator was a more or less habitual user of intoxicating liquor, and possessed some physical infirmities not infrequently found in men of his age, but they assert that such facts do not prove testamentary incapacity, citing In re DeVine's Estate, 188 Okla. 423, 109 P. 2d 1078; In re Anderson's Estate, 142 Okla. 197, 286 P. 17; In re Putnam's Estate, 1 Cal. 2d 162, 34 P. 2d 148; In re Shields' Estate, 49 Cal. A. 2d 293, 121 P. 2d 795. They also urge that the evidence proves neither that the testator was totally insane nor that the will was the result of an insane delusion, citing California cases. This court has never held that testamentary incapacity can only be established by proof of complete mental degeneration or an insane delusion. We have said that the test of testamentary capacity is the testator's capacity to understand the effect and consequences of his act (Bilby et al. v. Stewart et al., 55 Okla. 767, 153 P. 1173), but have recognized that there is no rule by which may be determined with precision where capacity ends, and incapacity begins, and have said this question should be determined from all the facts and circumstances of each particular case.

The transcribed evidence concerning the facts and circumstances of this case covers more than 1,400 pages bound in eight separate volumes, so that though it is our duty to carefully examine and weigh the same, it would obviously be impractical to attempt any detailed review of it herein. However, a few of the salient facts concerning this testimony will readily demonstrate that the trial court's judgment has sufficient evidentiary support.

The proponents introduced the testimony of two physicians and 24 lay witnesses, including the attorney who drew the will and the proponents themselves. The contestants introduced the testimony of four doctors and 49 lay witnesses, including themselves.

Mary Francis Lawson testified that her deceased husband had lived near Alex for 20 years and during the first 14 or 15 years of that time was a good husband and father, providing for his family, attending to his business, making substantial amounts of money, and taking an interest in church and community affairs; that in 1934 or 1935 he began to drink alcohol and whisky excessively, being drunk or having whisky on his breath at all times, and she began to notice changes in him which became

more pronounced until his death; that he'd leave home in the morning, be gone all day and come home at night drunk, sometimes·not having anything to say, sometimes mad and raving; that he'd bring a bottle of whisky with him that he'd put in the bathroom or under his pillow; that he'd sleep during the early part of the night and drink through the night; that he lost interest in his family and property and became careless in the handling of his business; that although he had made a considerable sum of money on the cotton market in 1934, he thereafter lost all interest in the markets, quit reading the newspapers and cut the telephone wires to their home; that he kept outstanding notes on which he paid interest, though he had plenty of cash on deposit at the bank; that he did not save any of the income from his farms in 1939 and 1940; that it seemed like his mind was that of a child; that he couldn't remember things from one day to the next; that he talked to himself, cursed people without calling their names and appeared scared if anyone came to their home; if she told him someone wanted to see him, he'd jump up and peep around the windows; that he talked about killing people and tried to persuade his son, Harley, to kill an acquaintance who he thought had arrested him; that he drew a gun on her; that he'd ask her to bake cornbread and then wouldn't eat it; that he'd throw away food she had prepared; that he'd put food, including fresh meats, between the mattresses of his bed and allow it to stay there until spoiled; that on one occasion he attempted to can grapes without washing them or taking the stems off; on another occasion he took all of the clothes out of a closet in their home and threw them in a toilet and when she asked him about it he just laughed and asked her what she wanted with them; on another occasion in January, 1940, while his family had gone to a school play in Alex, he poured 18 buckets of lard on their beds; another time had a negro hired hand cut tires he had purchased for the family car; on another occasion

when Mrs. Bledsoe, one of their married daughters, brought her baby to their home and was visiting with her in the home of a neighbor the baby's bed and clothing were burned under circumstances indicating that Lawson did it; and on still another occasion he pounded their cook stove with a hammer until it was broken and then had it buried in the garden.

Mrs. Lawson's testimony was strongly and convincingly corroborated by all nine of her children who testified, the youngest being 18 years of age. Some of these, together with a long line of other witnesses ranging from laborers on the testator's farms to business and professional men of Alex, some of whom had known the testator rather intimately over a long period and had observed him in a wide range of situations arising in daily life, related numerous instances or examples of his loss of memory and apparently irrational conduct. All of them who were interrogated on that subject and who were in a position to have well founded opinions on the matter testified that in February, 1940, Lawson was mentally incompetent to execute a valid will.

The evidence of contestants' medical experts was to the effect that he was suffering the physical as well as mental ravages of chronic alcoholism. A letter was introduced which Clella Ridley, one of the proponents, had written to Lawson's son, Marvin, as early as June 6, 1935, in which she said:

"Marvin, what in the world is going to happen to Dad if there isn't something done. I worry my head off but I see it isn't helping any. I know it is like *Hell* at home. It isn't right for Mary, Loyd, Harley and girls to have to put up with it.

"I think Dad has drank until he is crazy. I mean really crazy. He hasn't the expression on his face he use to have. He can't talk with sense at all, and if you ask me what I think I say he should be put some (place) where he can be treated and be himself again."

None of proponents' witnesses stated

specifically that the testator was mentally competent at the time he executed the will except the lawyer who drew it and his associate. More than one stated that they noticed a marked change in Lawson's appearance during the latter years of his life. Some said they noticed no difference in his actions when he was drunk and when he was sober and it is apparent from the testimony of most of them that they had not had the opportunities of knowing and observing the testator during the latter part of his life that most of contestants' witnesses had had.

Proponents' witness, testator's 41-year-old son, Lloyd, corroborated the contestants' testimony in many particulars. Others of the proponents' witnesses, who were associated with the testator almost daily and in a better position to know and observe him through the last few years of life than the proponents themselves, gave stronger evidence of his mental incompetency than of his competency.

Of proponents' medical witnesses, Dr. G. A. Walker, who had seen the testator last on June 27, 1940, denied that he was then suffering from chronic alcoholism. Dr. L. E. Woods, proponents' other medical witness, testified that from what little relationship he had had with the testator he did not feel capable of passing on his mental status. Later in his testimony, he indicated that he thought behavior such as attributed to Lawson by many of the witnesses was indicative of insanity.

Counsel for proponents make much of testimony to the effect that during the last year of his life, Lawson was conducting certain routine business matters such as selling some of his farm products, buying a tractor and making loans. They say that the proof fails to show any particular transaction that was improvident and suggest that little weight should be given testimony supporting the contestants' theory from certain witnesses who had transacted business with him at a time when, according to some of them, he was not normal. While we have said that "ability to transact business is not a true test of testamentary capacity" (In re Nitey's Estate, 175 Okla. 389, 53 P. 2d 215) and we recognize that one may be capable, by force of long continued practice or habit, or with the assistance of friends, relatives and employees, of going about routine affairs of everyday life, such as cashing checks and making purchases or sales, yet such evidence may be indicative of the degree of his mental capacity or incapacity. Consequently, in this connection, a frank, correct and complete appraisal of the record before us demands notice of evidence to the effect that during the last years of Lawson's life his business activities were not as extensive as they had once been, being confined more or less to a few routine matters; that because of his carelessness and mismanagement his sons and others assumed a larger share of the operation of his farms and conduct of his business; and that through mismanagement and improvidence, generally, his savings decreased substantially and the entire income from his farms was spent.

Counsel for the contestants call our attention to testimony tending to show that the testator consumed some whisky only a short time before going to his attorney's office to execute the will, and certain characteristics of said document such as the unnaturalness of the property disposition therein described and the inconsistency of certain of its statements with the true facts concerning previous gifts or advancements to contestants, the proportionate value of the homestead therein devised his widow, and to many other circumstances which they say refute the testimony of his attorneys that Lawson appeared to be sober and normal at the time he executed the will. Without unnecessarily lengthening this opinion with a discussion of this argument, and recognizing that though the testator was habitually under the influence of intoxicants he might have executed a valid will (In re DeVine's Estate, supra), we think it sufficient to say that, though at the time of its execution the testator may not have been mentally

deranged enough to be incompetent for all purposes, there was a decided conflict in the evidence as to whether his mind was sound for testamentary purposes. See In re Mason's Estate, 185 Okla. 278, 91 P. 2d 657. This is a matter about which very capable or even expert observers might very conscientiously and reasonably have differed, but in view of the record herein, the trial court's judgment that the testator did not possess testamentary capacity cannot be said to be clearly against the weight of the evidence.

The judgment is hereby affirmed.

HURST, V.C.J., and RILEY, OSBORN, BAYLESS, WELCH, and CORN, JJ., concur.