AMERICAN NATIONAL RED CROSS v. GUMBERTS et al.

No. 34925. June 3, 1952.

Rehearing Denied Aug. 5, 1952.

Application for Leave to File Second Petition for Rehearing Denied Sept. 9, 1952.

247 P. 2d 735.

Tomerlin & High, Oklahoma City, for plaintiff in error.

Ames, Daugherty, Bynum & Black, Oklahoma City, for defendants in error.

WELCH, J. Following an appeal from county court and on trial de novo in district court, it was decreed that a certain instrument dated January 24, 1945, and presented for probate as the last will and testament of Lillian Carrie Lamphear, deceased, be denied probate. The judgment rests on a finding that "on January 24, 1945, Lillian Carrie Lamphear was of unsound mind, and did not understand the effect and consequences of her act and did not possess testamentary capacity to make a will."

The American Red Cross, a Federal Corporation, claimant of interest under

terms of the instrument, brings this appeal, and here contends the trial court's findings and judgment are against the clear weight of the evidence.

According to the record the instrument presented for probate was in the handwriting of Lillian Carrie Lamphear. It read as follows:

"Los Angeles California January 24, 1945·I want all I have also in Safty deposit box to go to Red Cross and other societies nothing to my brother in Chicago or to his daughter and son or my sister in Evansville, Indiana.

"Carrie Lamphear

"My bank accounts are signed Lillian Lamphear."

Lillian Carrie Lamphear was of the age of 84 years in January, 1945. She became a widow in 1917 and never remarried. She lived in California and alone in her own home from 1917 to 1942. Her relatives all lived in distant states and she seldom visited with any of them. During the years from 1917 through 1939, she at various times bought and sold stocks and securities and during the time accumulated a sizable fortune in cash and certain stocks and securities of great value. She had three sisters, one of whom died at Mt. Vernon, Indiana, in 1895, one died at St. Louis, Missouri, in 1931, and one died at Evansville, Indiana, in 1940. For several years prior to 1940 and for the year 1940, Mrs. Lamphear listed the latter mentioned sister as a dependent on her income tax returns, but not after 1940. In 1943 she sold her home and shortly thereafter removed to a rental property, where she remained until August, 1945.

There was evidence to the effect that Mrs. Lamphear was a very miserly person and had never exhibited a particular interest in the Red Cross, and had never made any significant contribution to any charitable society or institution. It was shown that beginning about 1940 Mrs. Lamphear became careless and neglectful of her personal appearance and cleanliness and allowed her living quarters to become cluttered with rubbish and to remain unclean and untidy; that she often had no memory of very recent events, though she often spoke of events of the distant past with seeming clarity; that she often accused visitors, relatives or neighbors of the theft of inconsequential articles which she herself had mislaid. It was shown that in the period from December, 1943, to August, 1945, when she occupied a rental property, she lived as if she were in circumstances of extreme poverty, though she had cash and liquid assets of over $100,000. In this time she kept her house curtains down at all times and lived in an attitude of suspicion of all acquaintances and of strangers; her clothes were usually greasy and soiled; she kept spoiled and dirty food in the house and left garbage exposed and scattered about the premises; rats ran about the house and premises. In this time she wrote letters wherein she spoke of a rat as staying in the springs of her bed and as going to bed when she retired.

In October, 1945, Mrs. Lamphear arrived in Oklahoma City and at the home of her nephew. At the time, she was in a shocking state of personal uncleanliness and carried with her a package of stale food which she had carried with her from California. She remained in the home of her nephew until December, when she was removed to a rental apartment. There she spoke of seeing covered wagons encamped on adjacent lots and of her fear of them, and otherwise exhibited such delusions as created disturbances. In January, 1946, on order of county court, she was removed to a state hospital for insane where she remained until her death in 1949.

Upon entry into the state hospital Mrs. Lamphear was examined by physicians, specialists in the field of psychiatry. According to the testimony of an examining physician Mrs. Lamphear was then afflicted with senile psychosis, paranoid type, and in such advanced stage as to indicate the con-

dition had existed for a number of years. Senile psychosis was described as a degenerative disease, cumulative and progressive, caused from the ageing of the body organs, whose functions relate to reasoning power and emotional stability. Paranoid type was described as being associated with irritability, resentments and hostility arising from persecutory delusion. This physician witness, in addition to examination of Mrs. Lamphear on her entrance into the institution, had occasion to observe Mrs. Lamphear over a period of months while she was in the institution. The witness, given a history of prior acts and conduct of Mrs. Lamphear, in substance as we have above set forth, expressed his opinion that in January, 1945, and for several months prior, Mrs. Lamphear was incapable of intelligent action and had not the mental capacity to understand and appreciate the effect and results of any written disposition she might make of her property; that she was psychotic, mentally ill, and of unsound mind from the 1941, 1942 period onward. The witness expressed the view that in the instrument itself an advanced psychosis is manifested; that confusion is displayed in the terms of the instrument wherein she disperses her life's savings to "other societies," a vague group of organizations; that under the hypothesis that in 1940 she knew her sister at Evansville, Indiana, had died, confusion of mind is further manifested in the instrument by the manner of her reference to a sister in Evansville.

Another physician who had examined and observed Mrs. Lamphear during the time she was in the state hospital, and being given a history of her earlier acts and conduct, testified in substance that she was without sound mind and memory in 1945 sufficient to enable her to know and understand the business of making a disposition of her property as by will or otherwise.

Two physicians, psychiatrists, who had never seen Mrs. Lamphear, given a history as is generally set forth above,

expressed opinion that Mrs. Lamphear, in January, 1945, was capable of knowing the nature and extent of her property, and capable of calling to mind the natural objects of her bounty and was capable of understanding the nature and consequences of her acts at the time of her execution of the instrument here involved.

Lay witnesses who testified concerning acts and conduct of Mrs. Lamphear observed at a time shortly after she had sold her home, and from August, 1943, and over a period of months thereafter, stated they considered her mentally unsound and incompetent to transact business.

Lay witnesses who participated in the transactions involved in the negotiation and sale of Mrs. Lamphear's house in July, 1943, testified that Mrs. Lamphear appeared to understand what she was doing at all times in the discussion of terms of the sale and at the time she executed conveyance of her property.

In argument for reversal the appellant suggests that when the evidence herein is weighed and measured with the rule that every person is presumed to be competent, and by the rule that the burden of proving incompetency to make a will rests on the contestant, the judgment of the trial court cannot stand.

Under the first proposition stated in appellant's brief, there is presented a discussion of the general tests for competency to make a will as are stated in various decisions of this court.

In a second proposition, after stating the rule as to presumption of competency, and the rule as to burden of proof, the appellant states:

"Evidence of a weakened memory for present events, of physical weakness, or personal filthiness, of a tendency to live in the past, of occasional cloudiness, of occasional and inexplicable antipathy toward persons formerly close to the testator, and numerous other characteristics of marked old age

or senile psychosis in an advanced degree, will be given little or no weight, either as direct evidence or as basis for psychiatric opinion evidence, in the face of some direct evidence of mental capacity sufficient to meet the tests for general competency set forth in Proposition I."

Hereunder attention is directed to expressions of this court and of other courts in a number of cases wherein evidence of various erratical and eccentric acts and conversations of aged persons was held insufficient to show testamentary incapacity, and cases are cited wherein evidence of like nature was held of little value in the light of the other facts and circumstances of the particular case. There is no suggestion in these cases that such evidence is incompetent or not to be considered in connection with all the evidence as bears on the question of testamentary capacity, though such evidence alone and itself might not show an incapacity.

In Re Martin's Estate, Forbis et al. v. Morgan et al., 199 Okla. 567, 188 P. 2d 862, it was held:

"Testamentary capacity is a question of fact to be determined from all the facts and circumstances in each case.

"The presumption of sanity goes with everyone, the burden of proving testamentary incapacity in a will contest rests upon the contestant, and the finding of the trial court in such a case will not be disturbed on appeal unless it is clearly against the weight of the evidence.

"Testamentary capacity is to be determined as of the date of the execution of the will.

"A person has testamentary capacity when his mind and memory are such that he knows, in a general way, the character and extent of his property, understands his relationship to the objects of his bounty and to those who ought to be in his mind on the occasion of making a will, and comprehends the nature and effect of the testamentary act."

In Bilby et al. v. Stewart et al., 55 Okla. 767, 153 P. 1173, said the court:

"Testamentary capacity, or the lack thereof, is a question of fact. There is no rule by which it may be determined, with precision, where capacity ends and incapacity begins, but this question should be determined from all the facts and circumstances of each particular case; and, where the evidence fairly and reasonably supports the finding of testamentary incapacity, the same will not be disturbed on appeal.

"Ordinarily the test of testamentary capacity is the testator's capacity to understand the effect and consequences of his act, at the time the will is executed."

Herein, as above noted, medical experts who had examined Mrs. Lamphear on January 30, 1946, and had seen her from time to time during a period of several months thereafter, testified that she was insane in January, 1946, and then afflicted with senile psychosis to such an advanced stage as to be incapable of any intelligent action in a matter of the complexity of making a disposition of property. Acquaintances and relatives told of queer behavior and strange talks on the part of Mrs. Lamphear in the period from 1940 to 1945, inclusive, and from which they gained the impression that she was then of unsound mind and incompetent. On the basis of the behavior pattern as was described by these witnesses, and on the basis of personal observations of Mrs. Lamphear beginning in January, 1946, the medical experts expressed opinion that Mrs. Lamphear was in all of 1945, and for several months prior, afflicted with senile psychosis in such an advanced stage as to be continually incapable of intelligent action in a matter of the complexity of making a disposition of property, whether by will or otherwise.

The instrument, as written by Mrs. Lamphear and dated January 24, 1945, as named "other societies" as objects of her bounty, in its vagueness, presents the inference that Mrs. Lamphear was

without understanding of any relationship to the objects of her bounty, and reflects or demonstrates a confusion of mind. Her writing, as contemplates her death, and specifically denies any benefit to her sister in Evansville, Indiana, reflects a confusion of mind, under the circumstances in proof that she had definite knowledge in 1940 that her sister in Evansville had died.

Whether a person is suffering from senile psychosis, or senile dementia, or illness of mind due to senility, is in the first instance a question of fact to be determined by men of the medical profession who have made a special study of nervous and mental diseases, their evidence on the question of the effect of such ailments upon the mind and mentality must be given substantial weight. Insanity and testamentary incapacity are akin as are sanity and testamentary capacity, and in this field the evidence and testimony of doctors must be given much weight.

We think the testimony concerning the queer behavior of Mrs. Lamphear before and after and during the year 1945, and the terms of the instrument dated January 24, 1945, and advanced as the act of Mrs. Lamphear, coupled with the testimony of the doctors as examined Mrs. Lamphear, compel a conclusion that Mrs. Lamphear was mentally incompetent and without testamentary capacity long prior to and on January 24, 1945, and thereafter.

In Duckwall et al. v. Lawson et al., 197 Okla. 472, 172 P. 2d 415, it was held:

"This court will not reverse a judgment of the trial court in refusing to admit a will to probate unless the judgment is clearly against the weight of the evidence.

"Where, in a will contest, the testator was shown by a preponderance of the evidence to be a chronic alcoholic and from the evidence bearing upon the subject there was ground for a reasonable difference of opinion as to the soundness of his mind for testamentary purposes, held: trial court's judgment of the will's invalidity on account of testamentary incapacity was not clearly against the weight of the evidence."

The evidence given by the doctors who did not see Mrs. Lamphear, but testified from hypothesis, adds support to a presumption of sanity that accompanied Mrs. Lamphear, and likewise the testimony of the witnesses as had observed Mrs. Lamphear during business transactions and were of the impression she was sane. But the testimony of the witnesses as observed Mrs. Lamphear in her more intimate relations and at times nearer to the date of the execution of the instrument in question, and the testimony of the doctors who had examined her, and the terms of the instrument itself as a circumstance of the case, all considered together as a whole appear more compelling to the conclusion that she was incompetent at the time of execution of the instrument. We find the weight of the evidence favors the trial court's findings that she was without testamentary capacity.

The judgment is affirmed.

ARNOLD, C. J., HALLEY, V. C. J., CORN, DAVISON, JOHNSON, O'NEAL, and BINGAMAN, JJ., concur.