In the Matter of the ESTATE of Lealer BENNIGHT, Deceased.

Bessie Padgett WILLIAMS et al., Appellants,

v.

Houston W. BENNIGHT and Alberta Bennight, husband and wife, Appellees.

No. 43455.

Supreme Court of Oklahoma.

Oct. 24, 1972.

Rehearing Denied Nov. 28, 1972.

**204**

Harbison & Weber, Altus, for appellants.

Tolbert & Gillespie, Johnny Perry, Hobart, Kerr & Kerr, Altus, for appellees.

IRWIN, Justice:

Appellants (contestants) contested the admission to probate the Last Will and Testament of Lealer Bennight, deceased. The county court determined that the deceased was not of sound and disposing mind and memory, did not possess testamentary capacity, and denied its admission to probate. Appellees (proponents) appealed to the district court and that court admitted the will to probate. Contestants appealed.

One of the contestants, Bessie Padgett Williams, is a surviving sister of the testa-

trix. The other contestants are the children of a deceased sister of the testatrix. The proponents of the will are Houston W. Bennight and Alberta Bennight, husband and wife. Houston is a brother of testatrix's deceased husband who had died six days prior to the time testatrix executed her will on May 4, 1966. Testatrix died on March 7, 1968, and was in her seventies.

In the will, testatrix bequeathed $100.00 to contestant, Bessie Padgett Williams; $100.00 to a brother; and the remainder in equal shares to proponents. Proponents are the principal beneficiaries.

Contestants contend that the district court's determination that testatrix possessed testamentary capacity to make a will is not sustained by the evidence and is contrary to the weight of the evidence.

■ The question of testamentary capacity is a question of fact and the district court resolved that question in favor of proponents. A will contest is a case of equitable cognizance and on appeal the court will examine the whole record and weigh the evidence. If the judgment of the trial court is not clearly against the weight of the evidence, its judgment will not be disturbed on appeal. On the other hand, if the judgment is clearly against the weight of the evidence, such judgment will be set aside. In re Estate of Lacy, Okl., 431 P.2d 366.

The attorney who prepared the will was one of the subscribing witnesses. He testified that the first time he saw testatrix was when she and the proponents of the will came to his office to discuss the probate of the estate of her deceased husband and he had seen testatrix two or three different times before the will was executed. This was during the period of time between the death of testatrix's husband on April 28, 1966, and the time the will was executed on May 4, 1966.

This attorney testified that on the day the will was executed, deceased came to his

office and said she wanted him to "draw up some papers"; she was accompanied by the proponents, Mr. and Mrs. Bennight, and at his request, the Bennights left; she told him she wanted him to fix some papers so that when she died, her property would go to Mr. and Mrs. Bennight; pursuant to his request, deceased furnished him the names of her relatives; he discussed with deceased the purpose of a will and the nature of her property; and he prepared the will. This witness said he considered deceased mentally competent to make a will and did not observe anyone attempting to use any undue influence upon her; he read the will to her before the other two subscribing witnesses came into the room and again in the presence of the subscribing witnesses; and the will was duly executed and the subscribing witnesses signed the will in the presence of each other and the deceased. After the will had been executed and witnessed, the attorney said he handed it to deceased and she gave it to Houston, one of the proponents. He testified he saw deceased on several occasions when she was in his office in connection with the probate of her husband's estate and she always expressed a preference for Houston Bennight to handle her business affairs; and at her request, he prepared a power of attorney in favor of Houston Bennight and the same was executed.

Another witness to the will testified concerning the execution of the will; that she did not know testatrix prior to its execution; and did not remember testatrix but would not have been a witness to the will if she had thought testatrix lacked testamentary capacity.

Another witness, an attorney and witness to the will, testified that he typed the will and that it was duly executed and witnessed according to law. This witness testified he had seen testatrix before May 4, 1966, but had not had an extended conversation with her but on the day the will was executed testatrix was of sound and disposing mind and memory.

Contestants' first witness was a school teacher who had been testatrix's next door neighbor for the past 17 years and had been in her home 2 or 3 times a week. She stated testatrix was filthy, did not keep herself clean, and was not able to keep her home or perform household chores; that testatrix could not remember her doctor's appointments and the nurse had to call and remind her each time; in April and May, 1966, testatrix could not remember the days of the week nor the time of the day and sought information on both from her several times each day; that she would get lost going from her home to her own home next door; that testatrix thought she was poverty stricken and could not afford to buy food or clothing; and that she wore one dress several months and it was so filthy it was black. Testatrix was informed by her that she (testatrix) had $24,000 in the bank but it didn't mean a thing to testatrix.

This witness testified that testatrix relied entirely upon her husband to conduct their business affairs and testatrix despised Houston, one of the proponents, and that after Houston would visit with testatrix, she would be "upset, very upset, always." This witness was asked the following question: "In your opinion, on May 4, 1966, did Lealer Bennight have the mind and memory and mental capacity to call to mind who her relatives were, and who the natural objects of her bounty were, and to formulate a rational plan for the distribution of her estate?", and she responded: "She could never have done that."

Another witness for contestants, who moved next door to testatrix in 1951, testified he watched after testatrix every day and she had very little memory in April and May of 1966. He also testified substantially the same as the above witness regarding testatrix's physical and mental condition and memory. He also stated testatrix hated proponent Houston.

Another neighbor of testatrix, who had known testatrix since 1960, testified substantially the same as the above witnesses

regarding the physical condition of testatrix and her mental condition and memory. Another witness, who lives up the street from testatrix and had known her since 1933, stated she stayed with testatrix four nights after testatrix's husband died, and stayed with her the night she executed her will and said she was upset and would not know the consequences of executing a will. She testified substantially the same as the other above witnesses regarding testatrix's physical and mental condition and memory.

A doctor testified testatrix had been his patient since January, 1954; that she could not recall her birth date and gave him dates varying from 1900 to 1942; that in July, 1958, he gave testatrix drugs to improve the circulation to her brain so she could think better as she was not well orientated back then; that she had trouble knowing the days of the week and the time of her appointments; that she was not mentally clear at that time and her condition became progressively worse; that he saw deceased as a patient in his office the day before she executed this will; that her personal cleanliness deteriorated when her husband became ill; that she did not have the mental capacity on the day she executed this will to know the character and extent of her property; that during the last several years she didn't know what she was doing; and that deceased did not understand the nature and consequences of making a will and this was true back to 1958 and this condition grew worse; that she always paid her doctor bills at the office and would give her purse to the office girl and have the office girl take out the necessary amount of money; and that in May, 1966, he suggested she seek advice from an attorney about her property and she told him she didn't know what she had. This doctor had seen testatrix in his office several times close to the time the will was executed on May 4, 1966. His records disclosed that he had seen her on the 22nd and the 29th of March, 1966; on the 5th, 12th and 26th of April, 1966; and on the 3rd, 10th, 14th, 17th and 31st of May, 1966.

The doctor's nurse, who had worked for him about 17 years, testified substantially the same as the doctor regarding testatrix's mental, physical condition and memory during the time she was a patient. This nurse testified after testatrix would leave the doctor's office she would call back, sometimes within an hour, asking if she had been there or what day it was or the time of her appointment; that she was suffering from anemia and undernourishment and she suggested several times to testatrix about buying certain foods that would be easy for her to prepare and testatrix would say she couldn't afford it. This witness stated when testatrix came to the office she was dirty, had a long coat with no buttons on it, had on several suits of clothing or dresses and underclothing and that her shoes would be too large for her and tissue paper was stuck in them so she could keep them on her feet. Both the doctor and this nurse testified that on the day this will was executed testatrix did not have the mental capacity to know the character and extent of her property, to know who her relatives were and her relationship with them, to plan and understand a rational division of her property among her relatives or the natural objects of her bounty and did not understand the nature and consequences of making a will.

The above testimony does not include that of three other witnesses for contestants, who were either related to testatrix or were contestants.

Proponents submitted rebuttal witnesses. The first witness lives in another community and met testatrix the first time when he preached her husband's funeral. He visited with testatrix about 15 minutes before the services and about 5 minutes after the services. He stated she did not talk very much.

A husband and wife, who used to live next door to testatrix, testified. This couple moved to Lawton in 1951 and during the last 17 years, other than Christmas time, had visited testatrix about four or five times and had talked to testatrix about

five minutes at her husband's funeral. Another husband and wife, who had known testatrix about 50 years, testified in the last two years they had seen her at the doctor's office one time or on the street. They had not visited testatrix in her home during the last year or two and most of their testimony was directed at testatrix's condition as it existed many years ago.

The secretary for the attorney who prepared the will testified she first met testatrix in April or May of 1966, when she was in the office regarding the probate of her husband's estate; and that she later saw her either in the building or the bank. Another witness who was a tenant on testatrix's farm, stated he saw her three times after her husband died and that she did not recognize him the first or last time but did talk about the hay and crops. Proponent Houston, rented testatrix's farm to this witness after her husband's death. Lastly, the son and daughter of proponents, Houston and Alberta Bennight, testified for proponents.

In summary, each of the witnesses for proponents testified testatrix was clean and well dressed; that she was mentally competent to carry on her normal business, knew the objects of her bounty, the extent of her property, and had testamentary capacity to execute this will.

In American National Red Cross v. Gumberts, 207 Okl. 96, 247 P.2d 735, 739, we said:

"Whether a person is suffering from senile psychosis, or senile dementia, or illness of mind due to senility, is in the first instance a question of fact to be determined by men of the medical profession who have made a special study of nervous and mental diseases, their evidence on the question of the effect of such ailments upon the mind and mentality must be given substantial weight. Insanity and testamentary incapacity are akin as are sanity and testamentary capacity, and in this field the evidence and testimony of doctors must be given much weight."

In Gillespie v. Hancock, Okl., 377 P.2d 210, we held:

"Proof of testamentary capacity of a testator is not necessarily confined to the exact time of the execution of the will, but the court may consider such evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, as would tend to show his mental condition at the time of execution of the will."

In Albright v. Miller, Okl., 467 P.2d 475, there was evidence tending to establish that on the day the testator executed his will he appeared perfectly sober, was able to carry on a conversation and had been discharging his ordinary responsibilities. The county court admitted the will to probate and on appeal to the district court, that court denied its admission. We affirmed the judgment of the district court and in doing so, relied to a great extent on the medical evidence that testator did not have sufficient mental capacity to make a will.

█ The evidence is conflicting concerning the memory, mental and physical condition of the testatrix, whch covered periods of time prior to and after May 4, 1966, the day the will was executed. Although there is evidence tending to establish that testatrix, who was in her seventies, may have had testamentary capacity on May 4, 1966, we are of the opinion the clear weight of the evidence affirmatively establishes that she did not possess testamentary capacity. All the medical evidence supported contestant's claim that testatrix did not possess testamentary capacity. This evidence was given by a doctor who had treated testatrix for several years and had seen testatrix as a patient ten times between March 22, 1966 to May 31, 1966, and the will was executed on May 4, 1966. When this medical evidence is considered in connection with the testimony of other witnesses who had had close contact with the testatrix over the years and at the time the will was executed, the clear

weight of the evidence establishes that testatrix did not possess testamentary capacity to make a will on May 4, 1966.

We have examined the record and hold that the trial court's judgment determining that testatrix possessed testamentary capacity on May 4, 1966, to execute the will in question is clearly against the clear weight of the evidence.

Judgment reversed.

All the Justices concur.