[Sac. No. 4751. In Bank.—June 28, 1934.]

In the Matter of the Estate of ADAM PUTNAM, Deceased. W. M. PUTNAM, Respondent, v. WELLS FARGO BANK & UNION TRUST CO. et al., Appellants.

Heller, Ehrman, White & McAuliffe and Martin Minney, Jr., for Appellants.

H. C. Nelson and J. F. Quinn for Respondent.

SHENK, J.—Adam Putnam died on June 24, 1930, at the age of about eighty-two years. He was a resident of Ferndale, Humboldt County, and left real and personal property of the value of nearly $300,000. Two children survive him, a daughter, Edna Putnam, and a son, the contestant, William Mason Putnam. The decedent made a will dated November 15, 1927, and a codicil thereto dated October 19, 1928. These instruments were filed for probate. The son, W. M. Putnam, filed an opposition to the probate thereof, alleging general insanity sufficient to deprive the decedent of testamentary capacity, and insane delusions directly affecting the testamentary acts. Answers to the opposition were filed by the contestant's son, W. M. Putnam, Jr., a legatee under the will; by the Wells Fargo Bank & Union Trust Co., named as executor and trustee therein; by Edna Putnam, the decedent's daughter, and by Mabel C. Putnam and Thomas M. Putnam, Jr., cousin and grandnephew, respectively, of the decedent, who

also are legatees under the will. Testimony on both issues were received. A motion for a directed verdict was made on behalf of the proponents and denied. The jury found that the decedent was not of sound and disposing mind when the will and codicil were executed. The proponents moved for a judgment notwithstanding the verdict, which was denied. A motion for a new trial was denied. The persons answering said contest and opposition, who will be called the proponents, appealed from the judgment entered on the jury's verdict and from the order denying their motion for judgment notwithstanding the verdict.

Adam Putnam was born in Nova Scotia in 1847 and became an orphan at the age of four years. He came to Humboldt County, California, when he was about seventeen years of age and pursued the business of ranching and cattle raising. He was industrious, thrifty and energetic. In the course of years he acquired several ranches and dairy properties. In 1875 he married the daughter of "Dickey" Johnston and settled in Ferndale, where, in 1879, 1881 and 1882, two sons and a daughter were born. One son, Ed, predeceased the testator. In 1893 the decedent had accumulated a fortune and in that year participated in the organization of the Ferndale Bank, of which he was president until the time of his death.

By his will the decedent made the following disposition of his property: He devised and bequeathed the home in Ferndale with its furnishings and his automobile to his daughter, Edna. All of the rest of his property and estate he devised and bequeathed to Wells Fargo Bank & Union Trust Co., as trustee, to collect and pay the income thereof to the following persons: To Edna, his daughter, $500 per month during her lifetime; to his son, the contestant herein, $250 per month during his lifetime; to his grandson, W. M. Putnam, Jr., the sum of $25 per month during his life; to Bertha Johnstone, Mabel Putnam, Thomas M. Putnam, Jr., and Amelia Weir, each the sum of $25 per month during life; to the Ladies Club of Ferndale, $25 a month for a period of five years; to a specified cemetery, $50 a year for the care of the graves of the testator's parents. He directed that in case the income became insufficient to make the foregoing payments, they should be made from principal. All the rest of the income and profit from the

estate and the income payable to each beneficiary upon his death or otherwise were to be paid to "such societies and corporations in the state of California as are maintained mainly for the benefit and relief or uplift of the orphans of the state of California as my said trustee may, in its discretion, from time to time select as being worthy of assistance, in such amounts and in such manner as said trustee may in its discretion determine". The instrument contains a provision that any amount so left for the benefit of orphan institutions which shall be in excess of legal limitations shall vest in the decedent's heirs at law in accordance with the laws of succession then in force. The testator forgave all unpaid loans stated to have been made to his son W. M. Putnam, and canceled promissory notes signed by his son evidencing such loans. There is a provision against the validity of any assignment or garnishment of the income in the hands of the trustee, and a provision for the payment of inheritance and other taxes out of the residue. By the codicil the bequest of a life income to W. M. Putnam, Jr., was increased to $50 a month.

In presenting this appeal the proponents assert an absence of any evidence in the record to the effect that the testator was not capable of transacting his business affairs until shortly before his death and they rely on evidence which shows that despite the testator's daily use of intoxicating liquors during the latter forty years of his life, he continued as president of the Ferndale Bank and was capable of handling business affairs intelligently; that he was aware of the extent of his property and of the objects of his bounty and the relationship in which he stood toward those who had claims upon him, and was in fact an unusually intelligent, shrewd and energetic man despite his advanced years; and that until his last illness, which commenced a few weeks before his death, he went every day to attend to his business affairs at the bank. ▮ On the issue of general insanity the contestant relies mainly upon the habitual use of intoxicating liquors by the decedent, and the effect which the use thereof is stated ordinarily to have upon the physical and mental powers of the user. It may be said at the outset that the evidence is insufficient to support the claim of general insanity. There was

no showing that because. of the use of intoxicating liquors the decedent had become so weakened in his physical and mental powers that he was incapable of the testamentary act. Although it was in evidence that he collapsed at the preliminary conference with the trust officer of the Wells Fargo Bank & Union Trust Company, whom he requested to assist him in the preparation of his will, no showing was made or attempted that he was under the influence of intoxicating liquor at that time or when he executed the will and codicil, or that his habitual use of intoxicating liquor had any bearing upon the testamentary act. Nor was there any showing that the testamentary act was influenced by the cause of death, stated to have been arteriosclerosis, accentuated by influenza which attacked him a few weeks before death. On this state of the record the presumption of general sanity has not been overcome. (*Estate of Fraser,* 177 Cal. 266 [170 Pac. 601]; *Estate of Russell,* 189 Cal. 759, 770 [210 Pac. 249]; *Estate of McDonough,* 200 Cal. 57, 67 [251 Pac. 916].)

If the verdict may stand, it must necessarily be supported by the evidence relating to the second ground of the contest, viz., that the testator was laboring under an insane delusion with respect to his children and directly affecting the testamentary act. There is no substantial conflict in the evidence introduced in support of and in opposition to this ground of contest. The question is whether the undisputed acts and conduct of the decedent evidence an insane or any delusion in fact. It may be conceded that the beliefs and opinions which the testator held respecting his children influenced the disposition of his property as to them. It is the proponents' contention that the record discloses more than sufficient evidence to serve as a foundation of fact for such beliefs and opinions which removes them from the realm of being insane or any delusion in fact.

The contestant insists that the testator was possessed of an insane delusion which he described as an unexplained, intense and unwarranted hatred and hostility toward his wife and her blood relatives, particularly the contestant; an unfounded and fixed belief that his children were worthless and incompetent; that they had "too much Johnson"

and that they had no Putnam blood in them; an unfounded and fixed belief that whoever might marry his children had designs only on the testator's property and were awaiting his death to get hold of it; an unwarranted, unfounded and fixed belief that his children were spendthrifts and would dissipate and squander his estate within three years after his death and become public charges.

The following facts are claimed to support the foregoing statement: When Mason and Ed were boys, on one occasion the father beat them so severely with a cane that blood was drawn on Ed's leg. In 1916 or 1917 one witness saw Adam Putnam as he was walking from his home turn around and shake his clenched fist in the direction of his house and utter an opprobrious epithet. It was in evidence that Putnam repeatedly stated that Edna had no business ability and showed a lack of judgment in handling business matters; that he spoke of his children as being all Johnston, and that there was no Putnam blood in them; that neither his wife nor any of the Johnstons was any good; that he had no use for Mason's present or his divorced wife; and that he cursed Allison, a friend of Edna's whom he accused of waiting for him to die so that he could get part of the Putnam estate; that he talked around town of Allison and his intentions, also cast reflections upon the relations between Allison and his daughter until he was admonished by one witness that he was killing his own daughter by his unfounded remarks. After he made his will he wrote to the bank requesting that if it be in order a codicil to his will be prepared to provide against Allison's ever obtaining anything from the bequest to Edna.

On many occasions, beginning as early as 1905, Putnam, in the presence of others, made disparaging and profane remarks to his wife about her family which caused her to leave the room and weep. He accused his wife of being too much like her father "Dickey" Johnston, who was concededly honest but not much of a business man, and of spending all the money she could get her hands on. It was in evidence that the effect of liquor would make the decedent more cross and overbearing. He often stated that his children had no capacity for handling money; that Mason had no business ability; that there was too

much "Dickey" in him; that he would not let any of them handle his money, and that his children would only squander his money. He often said that his children were "no good", were spendthrifts, had too much Johnston blood in them, and were a "barrel of expense" and worthless. He had been heard to state frequently that he was not going to leave the boys anything because they did not know how to spend money, and that to speak to him about the Johnston family was like waving a red flag in front of a bull; that on one occasion he became so angry he was livid and trembled when the witness disagreed with him on the subject; that on another occasion he turned red in the face and gritted his teeth when he stated that there was "too much damned Johnston"; that he often became profane in connection with the subject; that on another occasion he jumped on his hat; and that he jumped up and down and gritted his teeth; and that on occasions he came home drunk.

He spoke unkindly to Edna about her friend Allison and his intentions and caused her to cry on several occasions. On other occasions he was heard talking and arguing on the subject in his room when no one else was present. Prior to the making of his will he had announced to witnesses that he was going to put his property in trust for the benefit of his children and inasmuch as he had been an orphan he would leave the rest to orphan asylums, that his own children would squander the money; that Allison was hanging around Edna only to get his money; that Edna was no longer of an age when a man would be likely to marry her for herself alone; that Mason's wife was an adventuress; that he did not care if the orphans squandered it, but he would fix it so his own children would not squander it.

The following further undisputed facts appear: Putnam placed Mason in Tamalpais Military Academy in San Rafael for two years before he reached his majority. Thereafter Mason attended business school in Eureka. In 1902 he started working for his uncle at the Bayside Lumber Co. in Humboldt County at $40 a month as a bookkeeper. About this time he took out a $5,000 life insurance policy on which his father paid the initial and most of the subse-

quent premiums. During this time his father apparently objected to some associates of Mason's whom the latter appeared to be assisting financially. Mason in answer to such objections wrote to his father that he was not proud of such associations, but that he realized he had obtained all the advantages he could expect from his parents and would look for no further financial assistance from his father. During this period Mason continued to visit the family during week ends.

In 1906 Mason went to Alaska and worked in copper mines, for a time underground and later as a bookkeeper and accountant, until 1911. During this period he sent between $3,000 and $4,000 to his father. Before he left Alaska he became interested in the fur business and with two others took a lease on Green Island for the purpose of raising fur-bearing animals. In 1911 he returned to California and lived in the Putnam family home in Oakland. He began drawing on his credit with his father and by November of that year had used up his savings. In that year he married Nina Putnam and continued to live in the Putnam home in Oakland. In 1911 and 1912 he obtained sums of money from two of his uncles and from a third party on his promissory notes for $350, $125 and $250. In June, 1912, he borrowed $1,055 on the life insurance policy, $400 of which he turned over to his father to discharge a note executed to Professor T. M. Putnam of Berkeley, and went back to Alaska with his wife. The fall of that year was spent on Green Island. That venture, representing an investment of $700 to $1,000, was sold out for $1,200. Thereafter until 1915 he and his wife lived at Kachemak Bay without income, engaged in hunting and fishing expeditions. Mason and his father continued to correspond and Adam Putnam was advised of these activities. In fact, Mason continued to write to his father in affectionate terms during the latter's lifetime and kept him informed of his activities and the details of his domestic life.

Mason borrowed money in Juneau in the spring of 1915 and he and his wife returned to the family home in Oakland. Mason spent part of that year in an attempt to raise money for a fox propagating venture in Alaska and

a corporation was organized for the purpose. Nothing came of it and Mason never returned to Alaska. From this time and while he was looking for work he incurred numerous debts, borrowed money and gave his notes, many of which his father discharged. Professor Putnam, to whom Mason went for assistance, often acted as a sort of intermediary between Mason and his father. At Adam Putnam's request he obtained information as to Mason's indebtednesses, including an amount which had been advanced to Mason to pay his transportation to Florida to take a position which had been offered him and which money he had spent. Professor Putnam discharged these obligations with money sent to him by the decedent. All of the details of this period and all of the correspondence between Mason and his father and the decedent and T. M. Putnam need not be recounted. During the Christmas holiday of 1915 Mason worked at Hale's in San Francisco at $15 per week. About March, 1916, he was employed as a bookkeeper by the Pacific Gas and Electric Company in San Francisco at a salary of $75 a month. From this time Mason visited the home at Ferndale during summer vacations and Christmas holidays. A son, W. M. Putnam, Jr., was born to the Mason Putnams in 1918. Prior to the birth of the child Nina Putnam worked for three months to obtain money to pay for the child's layette and clothes for herself. After the arrival of the baby the family sent down from Ferndale boxes of food. Periodically as a birthday gift Adam Putnam purchased a suit of clothes for Mason.

In 1923 Nina Putnam divorced Mason on the ground of nonsupport. Nina discussed with Adam Putnam her difficulties with Mason and the regularity of week-end drinking parties at their apartment over a period of eight years. Adam Putnam paid the expenses of the divorce and paid also the expenses of three operations performed on the child. At this time Mason was receiving a salary of $165 a month. So far as the record shows he has continued in the employment of the Pacific Gas and Electric Company. In 1923 Adam Putnam investigated Mason's chances for advancement in the company and received a report from its then president that Mason could not be advanced inasmuch as he showed no executive ability. In 1926 Mason married Mrs. Strange.

The foregoing is but a portion of the testimony with which the record is replete and which the proponents contend supports any belief which Adam Putnam possessed that Mason had no business ability and was incapable of any wise handling of money. His lack of knowledge of simple business transactions, despite his bookkeeping and accounting experience, is indicated by his own testimony.

It was in evidence that Edna Putnam, who always lived at home and managed the household after her mother's death, had extravagant tastes, and although Adam Putnam often complained of them, he nevertheless was indulgent by giving her expensive automobiles, a $1450 Steinway piano and a $2,150 diamond ring. He took her on trips to the Orient and elsewhere, even when her mother was living, and gave her shares of stock and Liberty Bonds, bought her a one-half interest in a gasoline service station, and allowed her to spend nearly $10,000 in remodeling and refurnishing the home at Ferndale.

It appears that as early as the year 1915 the decedent formed the intention of leaving his property in trust. In that year he wrote to Professor Putnam asking him to act as a trustee under his will.

From the foregoing brief statement and other evidence in a voluminous record, it is obvious that there was abundant ground to support a normal parental belief that the children were incapable of the wise handling of large amounts of capital. It cannot be said that the will is unnatural in view of the evidentiary facts. No case is cited by the contestant which goes so far as to hold that when a foundation in fact for the testator's belief is disclosed, such belief constitutes an insane delusion, or any delusion at all. The cases are to the contrary. The only reasonable conclusion from the record before us is that the testator was possessed of a parental belief, not abnormal or unfounded under the facts, relating to his son's ability to handle money, and that he took steps to protect him with an income adequate to his needs in addition to his own earnings for the balance of his life. Even though there may have been discord in the family during the decedent's lifetime or even injustice in the division of income between the children, that alone would not be sufficient to set aside a will executed by one in full possession of his mental

faculties and otherwise competent to make a will. An insane delusion has been defined to be the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis. "One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist." (*Estate of Scott,* 128 Cal. 57, 62 [60 Pac. 527]; *Estate of Shay,* 196 Cal. 355 [237 Pac. 1079]; *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45]; *Estate of Powell,* 113 Cal. App. 670 [299 Pac. 108].) The facts in this case do not meet the tests prescribed by our law and are inadequate as a foundation for setting aside the testamentary acts in question.

The judgment is reversed. The order denying the motion for a judgment notwithstanding the verdict is reversed.

Preston, J., Langdon, J., Curtis, J., and Waste, C. J., concurred.

Rehearing denied.