[Civ. No. 23096. Second Dist., Div. One. Jan. 2, 1959.]

Estate of THOMAS W. WARNER, JR., Deceased. ANITA LIPTON WARNER, Appellant, v. JEAN WARNER et al., Respondents.

Ralph Marks and Gunther Schiff for Appellant.

Marvin M. Chesebro, Harriet Pugh, Max Wisot and Harry Albert for Respondents.

WHITE, P. J.—Anita Lipton Warner, also known as Nora Warner, appeals from the order and judgment denying her motion for revocation of the admission to probate of her husband's will and codicil.

They were married in 1946. She was the fourth and last wife of the late Thomas W. Warner, Jr. Anita instituted an action for her separate maintenance in 1948. She was given the exclusive use of their home, and her husband was ordered to pay her regularly for her separate maintenance. She then, and continuously thereafter, refused to divorce him, although she instituted and prosecuted many court proceedings against him from the time of their separation until his death in 1955. Examples of such litigous conduct on her part are an attempt to enjoin and restrict decedent's business activity and to impound his assets, and her attempted intervention in decedent's action to recover damages for the loss of his eye which was injured in 1950 by a ricocheting bullet as he walked by a shooting gallery at Catalina.

The will and codicil admitted to probate left the bulk of his estate to his son and to the mother of his only child, his second divorced wife, the respondent, Jean Warner.

About 500 pages of clerk's transcript, over 1,600 pages of reporter's transcript, and 39 exhibits make up the record on appeal.

June 8, 1955, the will dated July 2, 1953, and codicil dated January 27, 1955, were admitted to probate and letters testamentary issued to Jean Warner and Manuel Ruiz, decedent's attorney who drew the will for him.

November 23, 1955, appellant filed her ''contest of will,'' seeking revocation of the probate of the will and codicil, on the grounds that at the times of their execution decedent was incompetent and acting under the undue influence of Attorney Manuel Ruiz and Jean Warner.

Jury trial was had, three special verdicts returned, and the jury reported its failure to agree as to the balance of the special verdicts submitted. Then, on respondent's motion under section 630 of the Code of Civil Procedure of California, Judge Bowron directed a verdict confirming the admission to probate of the will and granting a mistrial with reference to the codicil. Appellant's motion for a new trial was denied.

■ As urged by appellant, a motion under section 630 for a directed verdict, after the jury has been discharged upon its failure to agree, should be denied when there is any substantial evidence, or from the evidence any legitimate inference may be drawn which would support a verdict in favor of the plaintiff. (*Estate of Arnold,* 16 Cal.2d 573, 576 [107 P.2d 25]; *Palmquist* v. *Mercer,* 43 Cal.2d 92, 95 [272

P.2d 26] ; *Estate of Sargavak,* 95 Cal.App.2d 73, 75 [212 P.2d 541].)

Only the following verdicts were returned by the jury:

With respect to the due execution of the will dated July 2, 1953, and the codicil dated January 27, 1955, almost identical verdicts were returned, as follows:

"1. That it was signed by Thomas W. Warner, Jr.

"2. That at the time of signing by Thomas W. Warner, Jr. he stated to the two witnesses, Martha Jamin and Olive Kephart, (Alexander Ruiz and Olive Kephart, as to the codicil) that it was his will (codicil).

"3. That when Thomas W. Warner, Jr. signed the will (codicil), Thomas W. Warner, Jr. signed in the presence of the said two witnesses.

"4. That the two witnesses then signed the will (codicil) in the presence of Thomas W. Warner, Jr.

"5. That the two witnesses signed the will (codicil) in the presence of each other."

The other verdict reached by the jury was: "That Thomas W. Warner, Jr. made marks and interlineations upon Paragraph VI of the Will dated July 2, 1953, with the intention and for the purpose of revoking and cancelling only that portion of Paragraph VI of said Will which is so marked and interlined by him, and that the decedent was mentally competent to do so at that time."

By Paragraph VI of the will of July 2, 1953, decedent gave to Grigsby Stroud, the young son of a friend, $20,000; and to Evelyn Mae Miller (to whom, according to her testimony, he became engaged on Christmas of 1953) his house and furnishings in Reno, and $25,000 in cash.

At the time of the trial, said will had been marked in the following respects. The gift of $20,000 to young Stroud showed the $20,000 had a mark through it and the figure $5,000 was written above it. Also "21st" had been marked out and "30th" written above it to indicate the birthday upon which young Stroud was to receive his gift; and the gift to Mrs. Miller had a large "X" drawn across it.

By said will of July 2, 1953, the residue was left in trust for decedent's son and Jean Warner, his second wife, who divorced him and who is the mother of his son. Those provisions had not been marked in any way.

No verdict was rendered by the jury as to the actual date upon which either document was signed, and none as to testator's mental competence or freedom from undue influence

when executing either the will or the codicil admitted to probate and later contested by appellant.

The jury did, however, find that decedent was mentally competent when he made marks and interlineations upon Paragraph VI of the will of July 2, 1953, and that he intended by said marks to cancel or revoke only the portion of said will marked by him.

The evidence is without conflict that decedent marked only the portion making the gift to Stroud, the ''X'' through the portion of Paragraph VI making the gift to Mrs. Miller having been placed there by Mr. Ruiz at a later date. Decedent so interlined the bequest to young Stroud on the same day that he executed the codicil dated January 27, 1955.

Appellant is mentioned in the will of July 2, 1953, and it is clear from the language thereof that decedent purposely failed to provide for her. Appellant was in no manner prejudiced by the court's revocation of its admission to probate of the gift to Stroud, or the codicil of January 27, 1955. Therefore, in the instant appeal reversal is warranted only in the event the trial court was in error in denying the revocation of the probate of the will dated July 2, 1953.

The jury having failed to reach a verdict as to decedent's mental competency or the exercise of undue influence upon him at the time of the execution of said will of July 2, 1953, the judgment should be reversed if there is in the record any substantial evidence to support a verdict or conclusion that decedent lacked testamentary capacity or was unduly influenced at the time of the execution of said will.

As evidence of decedent's lack of testamentary capacity appellant relies upon the testimony of Evelyn Mae Miller ''together with her affidavit in support of the motion for new trial.'' The affidavit was not before the court when the order denying the motion for revocation of the probate of the will was made and therefore it cannot be considered on the instant appeal from that order. We have carefully read and considered the testimony given by Mrs. Miller at the trial. A fair summary of that testimony follows.

Mrs. Miller once worked in a bar in Phoenix. She first met decedent in the early part of 1951. Thereafter, he remained in her home for about two years.

She accompanied decedent to the office of his attorney, Mr. Ruiz, one of the defendants and respondents herein, on two occasions in 1952—it could have been the early part of 1953; on the first such occasion a will was discussed and prepared

while she waited; she was named in it as a beneficiary and it was executed by decedent in her presence; she saw decedent drink an alcoholic beverage in the office and presence of Mr. Ruiz on the second occasion, which was more of a social visit; they all had dinner at the Statler and decedent "drank an awful lot" and in her opinion became very drunk after the second visit to Mr. Ruiz' office.

She went to see the decedent after his accident when he was in the hospital at Needles in May of 1953 and she remained there with him "almost a complete month." At the end of May he was brought back to her home in Phoenix in an ambulance and she followed in her automobile. He was then bedridden in her home. "It was his back and spine which had been injured and his pelvis and one leg. . . . His right side was completely paralyzed. . . . He couldn't even sit up."

His first trip after the accident was with her when she and the decedent visited her parents in Prescott July 2d to 5th inclusive of 1953. He was able to leave the automobile only on his crutches and with the aid of her father when they arrived in Prescott. There he spent most of the time in bed at her mother's home. The first time he left the home of the witness and went to Los Angeles after his accident in Needles was on July 30, 1953.

The decedent started a business known as Classic and Custom Cars in Phoenix about September, 1953. Mrs. Miller became secretary-treasurer of the corporation. Decedent was the controlling stockholder and the president. In her presence, he did "drink at the place of business"; he kept "it all over the place, in the body shop, in the sales room, in the offices, even in my office." She attended two meetings at the place of business called and presided over by decedent when he was very drunk some time in the latter part of 1953 or the early part of 1954; during the time that she worked for the company in Phoenix, decedent did not appear to be competent "when he was drinking."

In her home decedent, once when he was "very drunk," threw a sword at her and missed her and hit the door, making "a tremendous hole in it." He "mistook" her "for some one the night he threw the sword" at her. That was in 1952. During the time she knew decedent it would be easier to name the times when he was sober than the ones when he was drunk. When he was drunk he was slovenly, "he was dirty and he had no control over his organs or kidneys or anything and . . . no coordination with his arms or his legs or anything."

"Many times" she took decedent to "alcoholic institutions." She took him to "an institution in Phoenix called Catalina on four different occasions."

Decedent gave her an engagement ring at Christmas of 1953, and a bracelet, watch and another ring in 1954—the bracelet and the watch on a trip they made to Mexico City, March 29, 1954, and the other ring "when he returned from a trip to his home in Pasadena."

She resigned from her work at the Classic and Custom Cars in the latter part of 1954.

The following is copied from Mr. Ruiz' cross-examination of Mrs. Miller:

"Q. Now, do you recall——Apparently you recall the will where Mr. Warner left you his home in Nevada and $25,000 cash, is that correct? A. I believe that was it, yes.

"Q. And do you recall what he said about that will? Did he make any statements to you with regard to it? A. Oh, he merely said that if anything should ever happen to him that I should contact Mr. Trautwein or Mr. Ruiz.

"Q. And did he ever tell you that in that will he was disinheriting Nora Warner (the appellant)? A. No, he did not.

"Q. Now, were you present when that will was signed? A. Yes.

"Q. Was he drunk on that occasion? A. No, I don't believe so.

"Q. Did he appear to have his faculties on that occasion? A. He appeared to.

"Q. Now, I will show you Proponents' Exhibit G, and I will ask you to read the last paragraph of Paragraph VI. A. Yes, sir.

"Q. Have you seen that before? A. Yes."

The will then shown to the witness was the one admitted to probate and dated July 2, 1953. As hereinbefore stated, Mrs. Miller had testified that from July 2d to the 5th, inclusive, of 1953, decedent was at her mother's home in Prescott and she was with him continuously.

She further testified that, after they returned to Phoenix, decedent took water therapy for about two weeks; that she helped him in and out of the pool and then he could use a cane instead of crutches; that she believed the will she saw executed was witnessed by "a girl that worked in the office" and Mr. Ruiz; and that decedent remained sober "from the time he had his accident (in May, 1953) until the time he left to come to Pasadena" (July 30, 1953).

Further testimony of Mrs. Miller is that she is almost positive that she was with the decedent in Mr. Ruiz' office in the "end of 1952. It could have been the early part of 1953," but she is "almost positive it was in 1952." She is positive that decedent did not "come to Pasadena the first of July, 1953." Her address is given in the will of July 2, 1953. She testified that she owned her home at that address for six years and lived there during both 1952 and 1953.

 While there is considerable evidence that decedent was in Mr. Ruiz' law office on July 2d, 1953, for the purpose of this appeal it must be assumed that Mrs. Miller's testimony was correct—or at least that the jury could have found it true. Therefore, the will of July 2, 1953, was not signed on the date it bears. Section 50 of the Probate Code of California sets forth the requirements for the execution of a valid will, all of which were found by the jury to exist as to the will dated July 2, 1953. Said section does not require that the will bear the date of its execution.

 The testimony of the two witnesses who signed the will and of two lawyers other than respondent Ruiz, who were in the office where the will was prepared and also witnessed its execution, is that the will was so executed on July 2, 1953. Considering the jury's special verdict and presuming the truth of Mrs. Miller's testimony that decedent was in Arizona during the entire day of July 2d, we infer, as the trial court must have done, that the will was prepared to be executed on that date, executed on a later date, and inadvertently the date was not corrected at the time of execution. The testimony of the witnesses to the execution of the will that decedent was then of sound mind and not acting under undue influence, therefore, remains undisputed.

Appellant, however, insists that she has proved that decedent was incompetent at times before and after the execution of said will, and that therefore it must be presumed that such incompetence continued between the instances proved.

 It takes more than "mere guesswork and general conjecture" to support a finding contrary to the presumption that a testator is competent. (*Estate of Teed,* 112 Cal.App.2d 638, 647 [247 P.2d 54].) Evidence, as in the instant action, that testator was a "chronic alcoholic," that he has been drunk on various occasions, and that he has taken several "cures," some of which consisted of bed rest, massive doses of vitamins, and food, does not tend to prove testamentary incompetence unless it is also proved that the time of decedent's drunkenness

coincided with the time of his execution of the testamentary document. (*Estate of Arnold,* 16 Cal.2d 573, 585 [107 P.2d 25]; *Estate of Powers,* 81 Cal.App.2d 480, 482 [184 P.2d 319].)

Appellant cites and relies upon the decisions in *Estate of Fosselman,* 48 Cal.2d 179 [308 P.2d 336], and *Estate of Collin,* 150 Cal.App. 2d 702, 712 [310 P.2d 663], in the latter of which Mr. Justice Fourt, speaking for this court, said: "Proof of testamentary incapacity and of the facts upon which a testator's state of mind depends is not necessarily confined to the exact time or moment of the execution of the will."

*Estate of Collin, supra,* affirmed on appeal a judgment admitting to probate a will dated December 19, 1951, and denying admission to probate a purported will dated October 24, 1952. That decision followed a finding that decedent "was of unsound mind and lacked testamentary capacity and was suffering from insane delusions and hallucinations from February 2, 1952, until his death by suicide on November 3, 1952." A reading of the eight-page summary of the evidence in that decision leaves no doubt that the finding of decedent's lack of testamentary capacity on October 24, 1952, is supported.

In *Estate of Fosselman, supra,* a judgment denying a petition for probate of a will and codicils was affirmed by the Supreme Court. There the trial court, sitting without a jury, found that at the time said purported testamentary documents were executed and continuously thereafter until the time of her death, decedent was "suffering from senile dementia and was of such mental incompetency as to render her incapable of executing a will, and was suffering from an insane delusion," that the beneficiary named in the will was "an old family retainer and a very old friend," when actually she had known her only a few months and only as an employee. The evidence therein summarized supports the court's finding of testamentary incapacity.

No such evidence is called to our attention by appellant in the instant action, and a careful reading of the entire record fails to disclose any evidence of decedent's incompetence beyond his temporary incoherence and instability when drunk. All witnesses who knew him testified that he appeared to be competent when sober. Each of the attesting and other witnesses to the execution of the will dated July 2, 1953, was of the opinion that decedent was then sober and competent.

In the absence of proof that the intemperate use of

alcoholic beverages, however long continued the habit is shown to have been, has actually destroyed testamentary capacity, no presumption will be indulged that it has thus been destroyed. (*Estate of Putnam,* 1 Cal.2d 162, 165 [34 P.2d 148].)

In the instant action, as stated by this court in *Estate of Garvey,* 38 Cal.App.2d 449, 458 [101 P.2d 551], "The evidence of overindulgence in alcoholic liquor as reflected in the record before us falls far short of the *quantum* required to establish the fact that decedent had become so weakened in his physical and mental powers that he was incapable of the testamentary act. (*Estate of Fisher,* 202 Cal. 205 [259 P. 755]; *Estate of Putnam,* 1 Cal.2d 162, 165 [34 P.2d 148].) Neither does the evidence in the instant case of repulsive or filthy personal habits, ill temper and a disagreeable disposition constitute insanity or unsoundness of mind. (Citations.)"

In the instant action, as in *Estate of Garvey, supra,* there had been interfamily litigation, and the family considered the will unnatural and unjust. ▪▪▪ As held in the *Garvey* case, decedent had a right to dispose of his property as he saw fit. Provision for his only son and his son's mother (his second divorced wife) and the disinheriting of his fourth wife, who was supported under a decree of separate maintenance and denied decedent the divorce he frequently requested during the last seven years of his life, is not such an unnatural or unjust will as could be considered any evidence of decedent's alleged testamentary incompetence. (*Estate of Garvey, supra,* p. 459; *Estate of McDevitt,* 95 Cal. 17, 33 [30 P. 101]; *Estate of Peterkin,* 23 Cal.App.2d 597 [73 P.2d 897].)

We have carefully examined the entire record in the instant appeal, and find no substantial evidence of decedent's mental incapacity to make a will. Nor does the record contain one iota of evidence of any attempt to exert undue influence upon decedent, or that he was at any time so influenced by any person.

The order and judgment from which this appeal was taken is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 25, 1959.