Filed 3/18/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHANNON EYFORD et al., <br><br> Plaintiffs and Appellants, <br> v. <br> JIM NORD, as Trustee, etc., et al., <br><br> Defendants and Respondents. | A157962 <br><br> (Napa County Super. Ct. <br> No. 17PR000071) |

Shannon Eyford and Erin Johnson appeal from a judgment entered after the trial court denied their petition to invalidate their grandmother's trust, which disinherited them. Appellants contend the court should have invalidated the trust pursuant to Probate Code section 6100.5, subdivision (a)(2),[1] because their grandmother had delusions that negated her testamentary capacity. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Catherine Pearson, known as "Kay," died in December 2016 at the age of 90 years.[2] In a trust instrument she executed on February 24, 2016, she named St. Jude Children's Research Hospital (St. Jude) the sole beneficiary of her estate, which was worth approximately $2 million. In that trust

---

[1]    All further statutory references are to the Probate Code.

[2]    The decedent was referred to simply as "Kay" throughout the trial court proceedings. We will refer to her in the same manner here.

1

instrument, she disinherited her surviving son and her two granddaughters (appellants Eyford and Johnson).

In April 2017, appellants filed a petition contesting the validity of the trust instrument on the ground that Kay had a mental disorder with symptoms including delusions or hallucinations that allegedly caused Kay to devise her property in a way she would not otherwise have done. (§ 6100.5, subd. (a)(2) ("6100.5(a)(2)").) As relevant here, the petition named St. Jude and Jim Nord, in his capacity as trustee, as respondents.[3] The matter was tried before the court. Ultimately, the court found that appellants failed to carry their "burden of proving that Kay was suffering from a delusion within the meaning of . . . section 6100.5(a)(2) at the time she executed the [t]rust." The following is a summary of the trial evidence and proceedings relevant to this appeal.

Early Background

Kay was born in September 1926. She had two children, Cathy Noyes and John Noyes, Jr., with her first husband, John Noyes, Sr.[4] In the early 1960s, after about 17 years of marriage, Kay and John Sr. divorced but remained friends and in contact for the rest of her life. In the 1970s, Kay married Robert Pearson, known as "Bob."

After her divorce from John Sr., Kay and her son became estranged. Kay, however, remained close with her daughter, Cathy, who married Buzz

---

[3]    The petition also alleged that Kay lacked testamentary capacity on grounds of undue influence by her accountant, Joan Sturges, and claimed that Sturges had converted trust assets. Nord, as trustee, settled the conversion claim against Sturges. The trial court's rejection of the undue influence claim is not contested on appeal and will not be discussed further.

[4]    For the sake of brevity, and clarity due to shared last names, we will refer to Cathy Noyes as Cathy, and John Noyes, Sr., as John Sr. After initial reference to Robert Pearson, below, we will refer to him as Bob.

Kane. Cathy and Kane had two daughters, appellants Eyford and Johnson. Bob and Kay frequently visited and corresponded with Cathy's family in Washington state, where they lived. Various witnesses described the relationship between Kay and appellants as close and loving.

In 2013, Cathy was diagnosed with cancer. After undergoing surgery, Cathy lived with Eyford, who helped care for her until her death from cancer in June 2014. Around the time of Cathy's death, Kay told numerous people that her estate was going to appellants. But the day after Cathy's death, Kay told a longtime friend, Roberta McCully, that appellants had caused Cathy's death by repositioning her in bed the night of her surgery against a doctor's orders. Later in 2014, Kay also told her friend Vicki Barrios that appellants caused Cathy's death by repositioning her in bed. At trial, appellants denied moving Cathy in her hospital bed contrary to doctor's orders.

Bob's Death and Kay's Hospitalization

In August 2014, Kay and Bob moved to a senior living community in Napa called "The Meadows." The Meadows offers different accommodations to residents depending on the level of care they might need, from independent living, to assisted living, skilled nursing, and memory care. One cannot live in independent living with a diagnosis of dementia, and Kay stayed in independent living until her death in December 2016. Eyford visited Bob and Kay for the Super Bowl in 2014 and in January 2015. Appellants both visited in 2015 for Mother's Day. Johnson and her son visited in August 2015.

In September 2015, Eyford visited while Bob was ill and staying in a rehabilitation facility at The Meadows. Bob died on October 1, 2015. Within weeks, Kay called John Sr. and said she was confused and alone. She also said that she did not know what she was doing and that Bob had taken care of everything. Indeed, during their marriage, Kay had little or no knowledge

3

of her financial affairs, including where she banked, and she had never signed a check.

Believing Kay was acting irrationally, John Sr. told her to go to the hospital and asked appellants to help her. On October 22, 2015, Kay was admitted to the hospital and treated for anemia and a urinary tract infection (UTI). Kay's medical records indicated she presented with confusion likely secondary to the UTI, and the confusion had "cleared" in the hospital. Johnson spent two nights at the hospital with Kay and later testified that Kay was combative and disoriented at the hospital and that she pulled out her intravenous lines and said she saw Bob above her bed. In the hospital, Johnson suggested that Kay put Bob's contacts in Kay's phone, then turn off Bob's phone. Kay did not like this idea and seemed attached to Bob's things. Johnson realized Kay "wasn't ready."

The Days Immediately Following Kay's Hospitalization

On October 25, 2015, Kay was discharged from the hospital, and Johnson drove her home. John Sr. and Eyford were present when Kay arrived at The Meadows. After Kay expressed concern about her finances, with Kay's consent and in her presence, John Sr. and Johnson (but not Eyford) went through Kay's records. They shredded outdated checks and records, and found documentation of an account worth $2.4 million, which Kay said she had no prior knowledge of.

On October 26, 2015, Eyford took Kay to Ole Health Clinic for cognitive testing. Eyford testified that the hospital had scheduled the appointment because The Meadows required an evaluation to determine if Kay needed changes to her living arrangements. At the clinic, Kay underwent a "mini mental status exam" which indicated she was experiencing mild to moderate cognitive impairment. Staff at the clinic scheduled another appointment to

4

fill out paperwork for The Meadows and to determine whether Kay needed to move from independent living to assisted living. That evening, Eyford went out alone in Napa to get some food and a drink, and Kay became very agitated, pacing and stating that Eyford was acting like a " 'floozy' " and " 'no woman should go out in town alone.' "

On October 27, 2015, appellants, John Sr., and Kay went to Kay's bank, and Kay put appellants on her account so they could help with her banking. On the same day, Kay also signed a will and a power of attorney that appellants obtained from the internet. The notarized power of attorney form named Eyford as Kay's attorney-in-fact, giving her power to make financial decisions for Kay, and it named Johnson the successor attorney-in-fact. The will Kay signed named appellants as Kay's sole beneficiaries. Concerned about the validity of that will, John Sr. advised Kay to consult an attorney.

On October 28, 2015, Johnson and John Sr. left town. Eyford stayed and took Kay to an estate planning attorney, James Watson, for purposes of preparing a trust naming appellants as her sole beneficiaries. Watson planned to have the documents ready for signing by November 9, 2015. Eyford and Kay returned to the Ole Health Clinic that day. Eyford told medical staff that Kay did not recall being there two days prior. Eyford also expressed concern about Kay leaving The Meadows unassisted and uncertainty whether Kay truly needed assisted living. Kay's records from that visit indicate that she presented as confused and disoriented, that she was unable to leave the facility unassisted, and that she was unable to manage her own cash. Another appointment was scheduled for mid-November for further mental health testing. Around this time, Eyford told Wayne Panchesson, director of The Meadows, that she did not think Kay should be driving. Eyford testified she told Kay to "please not drive the car,"

5

to which Kay responded by begging to keep her right to drive and becoming paranoid about where her keys were.[5]

During a dinner on October 28, 2015, Kay accused Eyford of being sent by John Sr. and Johnson to do the "dirty work," i.e., take away her independence, put her in assisted living, and take her car. Kay also accused Eyford of never visiting her at The Meadows. Kay pleaded with Eyford not to take her car or make her leave her apartment. Eyford tried to explain that she had in fact visited, and also that they "would let her maintain as much independence as [they] could." The next morning, Kay had no recollection of leveling these accusations at Eyford and affirmed her intention to keep her estate in the family. Eyford obtained Kay's permission to record part of this conversation. This was the last time Eyford saw or conversed with Kay.

Kay's February 24, 2016 Trust

On November 2, 2015, John Sr. returned to Napa and drove Kay to see attorney Watson without an appointment to try to move up the signing date for the trust. At that meeting, Kay told Watson that appellants had been "barging" into her home, and that she did not want to give her estate to them though she did not talk about any other potential beneficiaries. Watson felt uncomfortable executing Kay's trust and said he would follow up in a month.

On December 16, 2015, Watson again met with Kay. This time, Kay was accompanied by her accountant, Joan Sturges, and she expressed concern about appellants taking her money. Because this was the third meeting in less than two months, with different companions accompanying Kay each time, Watson was uncomfortable executing documents without a

---

[5] Kay's friend Roberta McCully testified Eyford called her and told her she was taking Kay's car. It is unclear when exactly this call occurred, but McCully indicated this was one of the bases for Kay's complaints against appellants after Bob died.

6

capacity declaration and was concerned about protecting both Kay and his office. Kay dismissed Watson after this meeting because she did not like him.

After dismissing Watson, Kay retained attorney Lori Hunt. Before seeing Hunt, Kay told Sturges she wanted her estate to go to "sick babies," but did not mention a particular charity or institution. On February 10, 2016, Hunt met with Kay and suggested St. Jude as a potential beneficiary; Kay loved the idea. When asked why she was disinheriting appellants, Kay replied that she felt she and Bob had given them enough through the years, that what she had was attributable to Bob, and that Bob loved helping sick babies, so she wanted to leave her estate to a charity that benefited sick babies to honor him. On February 24, 2016, Kay signed a trust that named St. Jude as her sole beneficiary and expressly disinherited her son and appellants. In July and August 2016, Kay signed amendments to the trust concerning the successor trustee, ultimately naming Jim Nord, a professional fiduciary, as the first successor trustee. Hunt indicated that at no time during her meetings with Kay did she form the impression Kay might have cognitive or mental problems.

Kay's Accusations Against Appellants and Other Evidence of Her State of Mind

Multiple witnesses testified that starting in November 2015, Kay began making accusations against appellants.

On November 4 and 5, 2015, Kay told Cole Hornstein, staff at The Meadows, that Eyford was trying to sell her car and had keys to her apartment, threatening to come in. Kay stated she was afraid of Eyford. Kay said that appellants were interested only in her money, that they were trying to say she had cognitive issues and could not handle her own affairs, and that Kay did not want to associate with Eyford. Kay also reported that someone had closed her bank account which had a zero balance. Hornstein, a

7

mandatory reporter, filed a report with an ombudsman in Napa, Adult Protective Services, and the police. Kay later told Hornstein that she had closed the bank account.

Officer Jarett Haggmark of the Napa Police Department interviewed Kay. Kay said that after Bob died, appellants went through her paperwork and tried to take her to an attorney and doctor. Kay also stated that Eyford was still in Napa staying with her. Officer Haggmark called Eyford who said she was at home, in Washington state. Officer Haggmark told Eyford it was best not to further contact Kay. Officer Haggmark testified that Kay seemed "out of it" and that Hornstein said he thought Kay was in the early stages of dementia. At trial, Hornstein denied saying this.

Johnson spoke to Kay over the phone several times in November 2015. During these calls, Kay called Eyford a "floozy," and said Eyford was no longer welcome at The Meadows because Kay did not feel safe and Eyford stole money and a bracelet from her. Johnson eventually tried to challenge Kay and explained she shredded Kay's papers, not Eyford, which caused Kay to become argumentative and end the conversation. During their final phone conversation, Kay accused Johnson of being in "cahoots" with Eyford and cut off contact with her as well.

In early November 2015, Kay saw her long-time accountant, Sturges, for the first time since Bob's death and accused appellants of stealing cash that Bob had stashed around the apartment and a bracelet. Sturges testified that during this first visit, Kay was underweight, nervous, paranoid, afraid, and confused. After November, Kay did not discuss appellants a lot. That said, Kay was afraid of "everything." She would not allow handymen into her home and was afraid of appellants being in town. Around June 2016, and once or twice before, Kay said she thought appellants were back in town or

8

back at her door. In June 2016, Sturges, who was unsure if Kay meant "at her door" literally, asked Hunt for a referral to an attorney to get a restraining order.

In spending time with Kay, Sturges observed Kay had memory issues. Of about 30 visits with Kay, Sturges noticed Kay having good days with no memory problems about six times, bad days about six times, and the remainder were somewhere in between. Sturges testified the day Kay signed the subject trust was a "good day," and Kay was clear-headed and expressed things to her that caused Sturges to believe Kay knew what she was doing.

In November and December 2015, Kay began making similar accusations about appellants to her friends Sharon Steele, Roberta McCully, and Vicki Barrios. Steele testified that during five separate visits she had with Kay after December 2015, Kay talked about appellants' misdeeds. During one visit in February 2016, Kay told Steele she changed her will because of their misbehavior, i.e., she believed they stole cash and a bracelet, took and waved her keys in her face, and wanted to get rid of her car. Once, Kay told Steele she was afraid she would be pushed over the balcony. McCully, who spoke to Kay by phone every day, testified that for about six months after late-2015, Kay said numerous times she believed Eyford wanted to kill her.

In addition to accusing appellants of taking cash and a bracelet, Kay told Barrios, whom she usually saw twice a month, that appellants "ransacked" her home looking for cash and that Eyford caused a disturbance while drunk in the lobby at The Meadows. Kay also claimed that when she confronted Eyford after finding her shredding documents in Bob's office, Eyford allegedly tried to lead her out on a balcony, causing Kay to fear for her life and to think that appellants wanted to push her off. Kay believed Eyford

9

took Bob's keys and could access Kay's apartment, and she was afraid Eyford might harm her. After December 2015, Kay repeated these stories to Barrios from time to time.

Kay also told Barrios after Bob's death that she changed the beneficiary of her estate to St. Jude because Bob always wanted that, that she had been the one to talk Bob into giving the money to family, and that she changed her mind. Kay said Eyford and Johnson came around only because they wanted money, and while she was sick with an infection, they took her to a doctor to deem her incompetent and also took her to a bank and to an attorney with "a very tight agenda around her assets." Moreover, although Kay was sick, grieving, and tired, Eyford kept trying to bait her into talking about money, and at one point Kay thought Eyford recorded their conversation. Kay told Barrios that all appellants had to do was be patient, but they got greedy, so they would get nothing and "[s]he didn't want them to have one thin dime."

Steele, McCully, and Barrios all testified that Kay always dressed very well, that her home was always clean, and that she never displayed confusion, disorientation, or memory issues after Bob's death.

Kay's doctors testified in accord. Dr. Margaret Poscher, Kay's internist, testified that she never noticed Kay exhibit delusions or paranoia, and that she never formed any concern that Kay might have dementia. Dr. Yelena Krijanovsky, Kay's hematologist/oncologist, also never noticed any cognitive decline or delirium in Kay.

The parties presented competing expert testimony concerning Kay's mental condition.

DISCUSSION

Appellants argue principally that the trial court erred in rejecting their claim of testamentary incapacity under section 6100.5(a)(2) by wrongly selecting a single false belief Kay had about appellants—i.e., that appellants "wanted her out of the way in order to get her money"—and then wrongly determining it was not a delusion. Instead, appellants claim, the court should have found that Kay's multiple false beliefs about appellants all constituted delusions negating Kay's testamentary capacity. Appellants contend that but for her delusions, Kay would not have executed the 2016 trust disinheriting appellants.

## A. Governing Law

"As a general proposition, California law allows a testator to dispose of property as he or she sees fit *without regard to whether the dispositions specified are appropriate or fair*. [Citations.] Testamentary competence is presumed." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604, italics added.)

Section 6100.5(a)(2) provides that "[a]n individual is not mentally competent to make a will if, at the time of making the will, . . . [¶] . . . [¶] . . . [t]he individual suffers from a mental health disorder with symptoms including delusions or hallucinations, which delusions or hallucinations result in the individual's devising property in a way that, except for the existence of the delusions or hallucinations, the individual would not have done."[6]

---

[6]     By its terms, section 6100.5 applies only to wills. Relying on *Andersen v. Hunt* (2011) 196 Cal.App.4th 722, appellants contend section 6100.5 also applies to trusts or trust amendments that, in content and complexity, closely resemble a will or codicil. (*Andersen*, at p. 731.) We agree and see no reason why section 6100.5 should not apply where, as here, a trust amendment reallocates the trust estate by disinheriting one set of possible beneficiaries and giving the entire estate to another beneficiary. (See *Lintz v. Lintz* (2014)

11

In this context, a delusion "has been defined to be the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis. 'One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist.' " (*Estate of Putnam* (1934) 1 Cal.2d 162, 172.) "If there is any evidence, however slight or inconclusive, which might have a tendency to create a belief, such belief is not a delusion." (*Estate of Alegria* (1948) 87 Cal.App.2d 645, 655.) "Capricious and arbitrary likes, dislikes and mistrusts are not evidence of unsoundness of mind." (*Ibid.*) "Care must be taken to differentiate between mere unreasonable opinions and mental derangements. Testamentary capacity does not depend upon the testatrix' ability to reason logically or upon her freedom from prejudice. A belief may be illogical or preposterous, but it is not, therefore, evidence of insanity." (*In re Estate of Perkins* (1925) 195 Cal. 699, 708 (*Perkins*).)

"The presumption is always that a person is sane, and the burden is always upon the contestants of the will to show affirmatively, and by a preponderance of the evidence, that the testatrix was of unsound mind at the time of the execution of the will." (*Perkins, supra*, 195 Cal. at p. 703.) "[T]he standard for testamentary capacity is exceptionally low." (*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 642.) "A person challenging the validity of a trust instrument on the grounds that the trustor lacked capacity

---

222 Cal.App.4th 1346, 1352.) Respondents do not contest *Andersen*'s applicability here.

12

to execute the document . . . carries the heavy burden of proving such allegations." (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545.)

## B. Standard of Review

As a preliminary matter, we address the appropriate standard of review. Respondents contend the substantial evidence standard of review applies to the trial court's determination as to whether Kay had a mental health disorder and an associated delusion sufficient to invalidate the trust. Appellants argue the de novo standard applies because the trial court referenced only one disputed issue of fact in its decision, "i.e., whether or not the name of St. Jude's as the beneficiary of the trust came from CPA Joan [Sturges] or attorney Lori Hunt," and the court's resolution of that disputed fact is neither relevant nor contested on appeal.

Generally, "the application of a statutory standard to undisputed facts is reviewed de novo." (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212.) That said, " '[w]here the ruling that is the subject of appeal turns on the trial court's determination of disputed facts, the appropriate standard of review on appeal is "sufficiency of the evidence." ' " (*Cochran v. Rubens* (1996) 42 Cal.App.4th 481, 486.)

Here, the ruling upholding the trust's validity turned on the trial court's determination of whether, at the time she executed her trust, Kay had a mental health disorder with symptoms including delusions or hallucinations that caused her to disinherit appellants. There appears no doubt that the relevant facts concerning Kay's mental state and mental condition were in dispute, and the parties presented conflicting evidence over the course of trial. For example, witnesses Hunt, Steele, McCully, and Barrios testified that Kay never appeared disoriented or confused or to be having mental trouble in 2016, while witnesses Sturges and John Sr. testified

13

differently. The parties also presented competing experts who provided different opinions about Kay's mental condition when she executed the trust. Under these circumstances, we decline to conduct a de novo review. Instead, we will review the trial court's determination for substantial evidence.

### C. Testamentary Capacity

Section 6100.5(a)(2) provides that an individual is not mentally competent to make a will "*if at the time of making the will,*" the individual has "a *mental health disorder* with symptoms *including delusions or hallucinations.*" (Italics added.)

In its statement of decision, the trial court found that Kay was not experiencing delusions within the meaning of section 6100.5(a)(2) at the time she executed her trust. Thus, the court implicitly determined Kay did not have the requisite mental health disorder at the time she executed her trust. Although the court acknowledged that Kay had delusions in late October 2015 while hospitalized for UTI, it determined her delusions ended shortly after her discharge from the hospital and were not operational when she signed the trust. The court further indicated that the medical experts opined Kay had moderate cognitive impairment, but "[o]ther than that, there is no evidence that Kay had dementia or any other mental condition that becomes worse over time. The only evidence regarding Kay's cognition, in addition to the mental health status exam at Ole Health, is that she had acute confusion in October 2015 secondary to a urinary tract infection and again likely in April and June 2016. Many of the witnesses . . . testified that they had no concerns regarding her mental capacity from November 2015 through her death a year later."

The record discloses substantial evidence supporting the trial court's determination. Dr. Angelone, an expert in neuropsychology, testified there

14

was no objective evidence that Kay had a mental disorder as required by section 6100.5(a)(2). Both Dr. Angelone and Dr. Cheyette, an expert in psychiatry, testified that Kay did not have delusional disorder. Likewise, Dr. Angelone testified there was nothing in Kay's medical records indicating she had dementia. Dr. Poscher—Kay's internist who saw her once in 2011, three times in 2012, twice in June and November 2014, and then the last time in October 2016—testified she never formed any concern that Kay might have dementia. Similarly, Dr. Krijanovsky—Kay's hematologist/oncologist who saw Kay about a dozen times from 2011 to November 2016, including in March and September 2014, and October and November 2016—testified she never noticed signs of cognitive impairment and never formed any concern that Kay might have dementia.

Even Dr. Spar, appellants' expert who opined Kay had delusions arising from a mental disorder when she signed her trust, testified the "second best" explanation for why Kay changed her estate plan did not involve any delusions: specifically, it was possible that appellants upset Kay when they "swept" into her life after her hospitalization, and that she did not want to give her money to them.[7] Dr. Spar acknowledged, after hearing all the evidence in the case, that a trier of fact could reasonably reach a different conclusion than the one he espoused.

Dr. Cheyette opined there was evidence that Kay had "mild cognitive impairment"—which is a slow decline of memory or other cognitive functions common among older people—but he testified delusions are very rarely

---

[7]     Indeed, Johnson herself testified about her concern that all of the things they did in October 2015 might have been too much for Kay at that time, given Bob's recent death and her medical condition. Kay's estranged son, John Noyes, Jr., similarly testified that Eyford and Johnson overstepped and did too much.

associated with mild cognitive impairment. Similarly, but more strongly, Dr. Angelone testified that mild cognitive impairment means a person has memory issues, but that delusions do not result from this condition. Dr. Angelone also testified that "mild cognitive impairment" is not a mental disorder in the "DSM."[8]

The record does establish that Kay had delirium in late 2015. Both Dr. Cheyette and Dr. Angelone opined that Kay developed delirium, which is a transient mental disorder, around the time of Bob's death and her hospitalization for UTI.[9] Both of the doctors indicated that delirium typically continues for short periods and clears with proper treatment. Both testified there was no evidence that Kay had recurrent UTIs.

This and other evidence, such as the testimony of Kay's long-time accountant, Sturges, and her attorney, Hunt, supports the trial court's conclusion that Kay's delirium was not ongoing when she executed her trust in February 2016. Sturges, who witnessed Kay sign the trust instrument, indicated that Kay had good days and bad days with regard to her memory and her mental state. Sturges testified that the day Kay signed the trust was "one of her good days," because Kay was clear-headed and had expressed things reflecting she knew what she was doing. Hunt—who had many years

---

[8] While Dr. Angelone testified that "mild cognitive *impairment*" is not in the DSM, he acknowledged that "minor neurocognitive *disorder*" is in the DSM. But Dr. Angelone never opined that Kay had a minor neurocognitive disorder. When asked about the mini mental status exam Kay took at the Ole Health Clinic, Dr. Angelone said her score showed she was experiencing moderate cognitive impairment. He explained, however, that this just captured her mental status on a particular day and was not a diagnosis of a mental disorder.

[9] The expert testimony established that infections, such as UTI, in elderly people commonly lead to delirium.

of experience in estate planning and experience with clients with questionable mental capacity—met with Kay both before and when she executed the trust and the two subsequent trust amendments. Hunt never observed Kay to be forgetful or confused or cognitively impaired. Kay never exhibited paranoia or having delusions about appellants, and Hunt never believed Kay had a mental deficit. (*Estate of Hansen* (1940) 38 Cal.App.2d 99, 115 [when an attorney who draws a will and becomes a witness to the instrument testifies that the testator appeared to be of sound mind and memory, such testimony is entitled to serious consideration though is not conclusive when other witnesses have testified to the contrary].)

Other witness testimony, including testimony from Kay's longtime friends Barrios, Steele, and McCully, also generally supports that Kay was lucid in the period when she signed her trust.

On this record, substantial evidence supports the determination that appellants fell short of establishing that Kay was living with a mental health disorder at the time she executed her trust. In reaching this conclusion, which is dispositive, we note that in their opening brief, appellants never argue Kay had a "mental health disorder" at the time she executed her trust, and they omit all mention of Dr. Angelone. But in their reply brief, apparently in response to respondents' argument that Kay had no mental health disorder, appellants argue that "[c]ase law does not require a specific finding of mental disorder; the determinant factor is whether the trustor was delusional at the time the testamentary document was signed."

This argument fails for a number of reasons. First, arguments made in a reply brief for the first time are too late. (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80, fn. 7.) Second, even if we set aside its untimeliness, we are not persuaded by appellants' sole authority in support of the aforequoted

17

argument, *Goodman v. Zimmerman* (1994) 25 Cal.App.4th 1667, which never examined whether section 6100.5(a)(2) requires a finding of a mental health disorder. (See *Goodman*, at pp. 1674–1678.) Third, appellants' interpretation would render the portion of the statute requiring that delusions stem from a mental health disorder mere surplusage, contrary to fundamental precepts of statutory interpretation. (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 453–454.)

Before concluding, we briefly address appellants' other arguments. First, appellants contend that the trial court erred in finding Kay had testamentary capacity by selecting a single false belief Kay had about appellants—i.e., that appellants "wanted her out of the way in order to get her money"—and determining it was not a delusion. We see no error. Reading the statement of decision as a whole, the court found that Kay had several false beliefs and that such beliefs were tethered to facts and therefore not delusions,[10] and also that Kay had some delusions in October 2015 or

---

[10] Specifically, in the part of its decision preceding its analysis of appellants' testamentary capacity claim, the trial court discussed Kay's various beliefs regarding appellants, observing: "[t]here was little evidence Kay's negative thoughts and claims about [appellants] were true. In fact, most of her claims were demonstrably false. [Appellants] did not steal her money or jewelry. They did not make any transactions on her bank accounts. They shredded outdated documents only with her consent. They did not shred photographs. They put their names on her bank account only with her consent. They prepared powers of attorney only with Kay's consent. Shannon did not push her on the balcony or any other place. They did not pressure her to name them as her beneficiaries and agents against her will. They did not want her dead. They did not show up in the parking lot or at her apartment trying to get in. They did not attempt to have her deemed incompetent. They did not try to sell her car. They did not do anything to cause the death of their mother Cathy. They did not harass her in any way." Following this recitation of Kay's beliefs regarding appellants, the court nonetheless rejected the testamentary capacity claim upon finding that Kay

18

shortly thereafter which were not operational when Kay signed her trust in February 2016. While the court specifically addressed Kay's belief that appellants "wanted her out of the way in order to get her money" and whether it constituted a delusion, it is evident that the court was not indicating this was the only false belief or alleged delusion at issue.

Second, appellants argue the trial court committed reversible error by not specifically addressing whether each alleged false belief was a delusion as they claimed. This argument, however, is unaccompanied by citation to authority. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.) Respondents cite to *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, which provides that "[a] statement of decision need not address all the legal and factual issues raised by the parties. . . . [A] trial court rendering a statement of decision is required only to set out ultimate findings rather than evidentiary ones." (*Id.* at p. 1125, citations omitted.) Appellants do not disagree with *Muzquiz*, and instead explain that "[w]hat they are complaining about is the trial court's complete failure to recognize that there was *no* evidence supporting a dozen or so of Kay Pearson's oft expressed beliefs about facts—not motives or attitudes, but hard facts for which there was zero evidence in the real world. These imagined facts influenced Kay's decision to disinherit her granddaughters."

Understood as an argument that the court erred by failing to find that all of Kay's false beliefs about appellants were delusions (including the false belief that appellants "wanted her out of the way in order to get her money"), we need not and do not address that argument. As discussed, there was substantial evidence that Kay did not have "a mental health disorder" as

---

had "irrational and false beliefs" but they could be accounted for by a reasonable hypothesis. (See *Estate of Putnam*, *supra*, 1 Cal.2d at p. 172.)

contemplated in section 6100.5(a)(2) at the time she executed the trust instrument.  This is dispositive under the statute and renders unnecessary further analysis of whether her false beliefs were not delusions because they resulted from " 'a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist.' " (*Estate of Putnam*, *supra*, 1 Cal.2d at p. 172.)  For the same reasons, we also decline to address appellants' claim that, as a policy matter, the court should not allow appellants' actions, done with good intentions to assist Kay, to support a "reasonable hypothesis" to preclude a false belief from being a delusion.

In closing, we recognize the result here is likely a very disappointing one for appellants.  Nevertheless, we are bound to apply the law (*People v. Mowatt* (1997) 56 Cal.App.4th 713, 720) and, under the substantial evidence standard, our role is circumscribed.  We cannot reweigh the evidence; we determine only if there is any substantial evidence, contradicted or uncontradicted, which will support the judgment.  (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

20

_____

Fujisaki, Acting P.J.

WE CONCUR:

_____

Petrou, J.

_____

Jackson, J.

A157962

EYFORD et al. v. NORD et al. (A157962)


Trial court: Napa County


Trial Judges: Hon. Diane M. Price


Attorneys:

Stephen H. Fredkin for Plaintiffs and Appellants.


Tara L. Cooper; Epstein & Holtzapple, Robert F. Epstein, Robyn B. Christo; Bien & Summers, Elliot L. Bien for Defendants and Respondents.