[Civ. No. 25737. Second Dist., Div. One. May 25, 1962.]

Estate of LONNI ROSS, Deceased. HAMILTON ROSS et al., Contestants and Appellants, v. ROBERT HENIGSON, Individually and as Executor, etc., et al., Defendants and Respondents.

Swerdlow, Glikbarg N. Nicholas, F. M. Nicholas and Allan Albala for Contestants and Appellants.

William T. Coffin, Richard D. DeLuce and Greenbaum, Baker & Ancel for Defendants and Respondents.

WOOD, P. J.—In this contest of will after probate, the contestants appeal from summary judgment in favor of defendants (respondents).

Lonni Ross made a purported will on October 23, 1957. She, a resident of Los Angeles County, 31 years of age, died on August 23, 1959, in Germany, while on a European tour. Her heirs at law are her parents, Mr. Hamilton Ross and Mrs. Henrietta Ross. The will was admitted to probate on September 22, 1959, without anyone's contesting it. Her estate was of the value of approximately $100,000.

By the terms of the will she disposed of her property as follows: To her friend Joyce Green—her automobile, furniture, jewelry, and personal effects. To her friend Jack Green —$2,500. To her cousin Eleanor Cohn—one-fourth interest in certain real property. To her friend Robert Henigson— the residue of her estate.

Robert Henigson, who was named executor in the will, was appointed executor.

On March 17, 1960 (after probate), Mr. and Mrs. Ross, the parents of decedent, filed a contest of the will.

The allegations regarding the seven alleged grounds of contest were in substance as follows:

1. Contestants "are informed and believe" that the signing of the will was not made, nor acknowledged, by her in the presence of the witnesses; that she did not declare, in the presence of the witnesses, that the will was her will; that the witnesses did not sign the will at the testatrix' request or in her presence.

2. At the time of executing the purported will, decedent was of unsound mind and was incompetent to make a will.

3. Contestants "are informed and believe" that the purported will was procured by the undue influence of defendants Henigson, and Joyce and Jack Green in that a confidential relationship existed between decedent and said defendants,

and the relationship was coupled with the activity of defendants in the preparation of the instrument, and the defendants occupied the position of fiduciaries toward decedent.

4. Contestants ''are informed and believe'' that the purported will was procured by the undue influence of said defendants in that a confidential relationship existed between decedent and defendants, and that defendants will unduly profit, and that they actively participated in the preparation of the will.

5. Contestants ''are informed and believe'' that the purported will was procured by the undue influence of said defendants in that . . . (the statements here made in this ground of contest are the same as the statements at a similar place in the 4th ground of contest). Contestants ''are informed and believe'' that said defendants entered into a conspiracy for the purpose of inducing the decedent to bequeath the major part of her estate to them. Defendants have been guilty of oppression, fraud, and malice.

6. Contestants ''are informed and believe'' that the defendants succeeded in substituting their will for the will of the decedent, and that defendants solicited the execution of the will, and by taking advantage of her grave condition of mind and body they succeeded in having the decedent sign the will.

. 7. Contestants ''are informed and believe'' that the defendants made false representations concerning the contestants for the purpose of inducing decedent to make the will disinheriting contestants; that such representations were that contestants bore no love for decedent, and they were not interested in her welfare.

In the prayer of the contest, the contestants asked, among other things, for punitive damages for treble the value of the estate.

Defendants' answers to the contest were, in substance, denials of the allegations as to the grounds of the contest.

Thereafter, defendant Henigson made a motion to strike that part of the prayer which asked for punitive damages. The motion was granted (apparently on the basis that in the probate proceeding the issue was not damages but whether the document was the will of decedent).

Defendants also made motions to strike the first, third, fourth, fifth, sixth, and seventh grounds of contest for the reason those matters were sham and fictitious, were based upon false allegations, and were not brought in good faith,

and that maintenance of the contest on the grounds of lack of due execution of the will, and of undue influence and fraud in the execution of the will constitutes an abuse of process of the court.

Prior to making those motions, the defendant Henigson took the deposition of the contestants. Each contestant testified therein that he or she did not have any personal knowledge of the matters alleged on information and belief (i.e., the allegations regarding lack of due execution of the will, and regarding undue influence, conspiracy, malice, oppression, and fraud). They testified that the only information they had regarding those matters was information furnished by their former attorney who prepared the contest, who told them that he had made an investigation, but he did not state the details of the investigation.

In support of the motions to strike said six grounds of contest, the defendants referred to said depositions of the contestants, and they also submitted their own affidavits. In their affidavits they made statements regarding their acquaintance and association with testatrix, and they denied the charging allegations of the contest regarding their alleged influence and participation in making the will. They also said they did not know of the existence of the will until after the death of the testatrix, and they were not aware of her intention to make a will. The motions were granted, and the court made an order on August 24, 1960, striking the first, third, fourth, fifth, sixth and seventh grounds of contest from the petition to revoke the will. Appellants (contestants) make no contention on appeal regarding that order. It thus appears that the appeal herein relates only to the second alleged ground of contest (that decedent was of unsound mind and was incompetent to make a will).

Thereafter, defendants made motions for a summary judgment dismissing the petition to revoke the probate of the will. The motions were made upon the grounds that there was no genuine issue as to any material fact to be tried; and that decedent had testamentary capacity at the time of making the will on October 23, 1957.

The motions were granted, and the court made an order on November 23, 1960, dismissing the petition to revoke probate of will, and directing entry of summary judgment in favor of defendants. In that connection, the court made a finding that the second ground of the petition has no merit and there is no triable issue of fact. A summary judgment, filed No-

vember 23, 1960, and entered November 28, 1960, provided that contestants take nothing by their said petition, and that defendants recover costs.

Contestants' notice of appeal states that they appeal from the judgment entered on November 23, 1960.

Appellants contend that there was a triable issue of fact as to whether the testatrix had testamentary capacity.

■ The declaration of Jay J. Stein, in support of the motion, stated: He has practiced law in Los Angeles County since 1933. He became acquainted with the testatrix in September 1956 when she consulted him regarding her marital difficulties with her then husband Jesse Garber, M.D. He represented her until October 1958. She was sued for divorce. Mr. Nicholas, who is one of the attorneys representing the contestants, represented Dr. Garber in that divorce action. Declarant represented the testatrix and Mr. Nicholas represented Dr. Garber in negotiating a property settlement agreement between the parties in January 1957. Later in that January, testatrix filed a cross-complaint for divorce and obtained a decree of divorce thereon. While he represented her, no question was raised by her husband, or any of his attorneys, or by the parents of testatrix that she lacked mental capacity to make said agreement or to be a party to the divorce action. On October 21, 1957, she came to declarant's office and conferred with him at length relative to making a will. She made a detailed explanation of the nature and extent of her property. She instructed him that she desired that her friends, Jack Green, Joyce Green, and Robert Henigson, and her cousin, Eleanor Cohn be the sole beneficiaries of her estate. During that conference he took notes which he retained in his file, which notes are attached to his declaration. (Two pages of handwritten notes are attached.) Included in the notes are references to his discussion with her respecting the disinheriting of a child that might be delivered as a result of her existing pregnancy. He prepared a form of will in accordance with her instructions. On October 23, 1957, she was in his office and he reviewed the form he had prepared and she expressed her satisfaction with its terms. On that day, in his presence and in the presence of his secretary, Barbara Leff, both being present at the same time, the testatrix declared to them that the instrument was her last will, and she did thereupon execute the same in their presence. He and Leff then subscribed their names as witnesses to the will. In January 1958, acting on testatrix' instructions, he prepared

for her a form of trust indenture to be executed by her in favor of Jack Temkin, trustee, and also a form of agreement to be executed by her, Temkin, and Hamilton Ross Investments, which was a partnership consisting of her parents. Her parents desired an agreement which would assure them repayment by testatrix of loans made to her by the partnership. In connection therewith, declarant conferred with Mr. Hamilton Ross. The agreement and indenture were executed on March 28, 1958. No question was raised that decedent lacked mental capacity to make the agreement or to make a conveyance in trust of certain of her property. In the opinion of declarant, the testatrix, on each occasion that declarant saw her during the period from September 1956 to October 1958, had testamentary capacity. On October 23, 1957, he knew that she regularly took sleeping pills. On several occasions when he spoke to her by telephone he believed that she was intoxicated or under the influence of such pills. He does not know Robert Henigson or Jack Green, and to the best of his knowledge he has never met either of them. He never communicated with either of them prior to testatrix' death. He met Joyce Green on two occasions—once when he interviewed her as a witness in the divorce case, and when the decree was rendered. He never disclosed to anyone, other than Barbara Leff, any of the provisions of the will.

The declaration of Barbara Leff, in support of the motions, stated: She was employed as a legal secretary by Mr. Stein from October 1953 to September 1959. She became acquainted with testatrix about September 1956 and conversed with her at the office approximately a dozen times. On each such occasion the testatrix appeared normal, and talked coherently. She (testatrix) also spoke coherently on the telephone. In the opinion of declarant, the testatrix had the ability to understand the nature, extent, and character of her property, and to understand her relation to persons about her. On October 23, 1957, the testatrix came alone to the office. On that day the testatrix, in the presence of declarant and Mr. Stein, both being present at the same time, declared to them that said instrument was her last will, and she thereupon executed the same in their presence. Declarant and Mr. Stein then, at testatrix' request, subscribed their names as witnesses to the will. She (declarant) knew on October 23, 1957, that the testatrix had been and was under the care of a doctor. The testatrix never exhibited any evidence that she was

intoxicated or drugged. She walked normally and was oriented as to time and place. Declarant never disclosed to anyone the provisions of the will.

Dr. Frank, a physician, stated in his declaration (filed by defendants) : Testatrix was his patient from October 1954 to June 1958. He saw her about 50 times. On one occasion he saw her in an irrational condition. That was on May 5, 1957, when she was hospitalized by reason of a severe overdose of seconal, a drug of the barbiturate class. In his opinion, the irrational behavior, which continued two or three days, was the result of her sudden withdrawal from the barbiturate. On no occasion other than the one mentioned above did he ever see her when she failed to recognize him or the persons in her presence in their true relation to her. She frequently used seconal for sleep-inducing purposes. When under its influence, she would exhibit disturbances in speech and various reflexes which would be detectable by the lay person who probably would characterize her as intoxicated. During the time she was his patient (except as above noted), she possessed a good memory, talked coherently, had normal facial expressions, normal reflexes and coordination. It is his opinion that on each occasion when he saw her, with the exception above noted (May 1957), she had testamentary capacity, that she was able to comprehend the nature, extent, and character of her property, and was able to understand her relation to persons and, in particular, her relation to her parents. He knew her parents and on occasion he talked to them in her presence, and she recognized them as her parents. He (declarant) does not know the nature and extent of her property, but she complained to him frequently that her father was trying to obtain a transfer of all of her property to him on the representation that he would thereafter care for her.

The declaration of Joyce Green, in support of the motions, stated: She has known the testatrix since 1953. During that time, and particularly in 1957 and 1958, they were close friends. When testatrix was in the city they saw each other at card games at least weekly and at other times. They talked on the telephone frequently, and when she was out of the city they corresponded. She was in full possession of her faculties. She recognized her parents and discussed them frequently. She appeared to manage her property and finances in a manner that never raised a question about her ability to do so competently. She took barbiturates in some quantity, but never appeared to be so affected that she did not know

what she was doing. Declarant did not know, until after the death of testatrix, that she had executed a will, but declarant is sure that she had the mental capacity to understand the act of making a will, and to understand the nature of her property and her relation to any person who might have a claim upon her bounty. The testatrix left the country about July 4, 1957, and did not return until August 1957.

Dr. Levy, a physician, made two declarations—one on October 18, 1960, and the other on October 24, 1960. In the first declaration (filed by contestants) he stated: He, Dr. Frank, and Dr. Luster treated testatrix from May 1, 1957, to May 5, 1957, when she was hospitalized. She was suffering from acute barbiturate and meprobamate intoxication as a result of a massive overdose of seconal and miltown. She was close to death. He was called into the case as a consultant by her parents by reason of his specialty in poisons. She was of suicidal intent and highly disturbed. In his opinion, in view of her suicidal intent and disturbed nature, she at no time could know the nature of her acts so as to dispose of her property by will.

In his (Dr. Levy's) second declaration (filed by defendants) he stated he became acquainted with testatrix about May 1, 1957, and he had not seen her after she left the hosiptal on May 5, 1957. When she regained consciousness, she was enraged that her suicide attempt was unsuccessful. While hospitalized, she made another suicidal attempt. During the time she was conscious at the hospital she knew she was under medical care and where she was, and she recognized him as one of her doctors and recognized persons in their true relationship to her. During that time he saw her in the presence of her parents, and she recognized them. When Mr. Nicholas, one of the attorneys for the parents, requested the (first) declaration, which this declarant made on October 18, 1960, he did not explain the meaning of testamentary capacity. The opinion expressed in that declaration was not intended to be a legal opinion but was his opinion that testatrix was of unsound mind in a medical sense when he treated her from May 1 to May 5, 1957. On October 24, 1960, Mr. Henigson called him by telephone and said he was executor of the will. In response to questions by Mr. Henigson, the declarant explained the matter regarding his former declaration of October 18. The executor asked for a further declaration so that the court might be fully advised of the basis for the opinion of October 18. It is for that purpose that this

additional declaration is made. Declarant cannot say that the condition of testatrix, with which he was familiar on May 5, 1957, had any necessary relationship with her mental condition on October 23, 1957, and he does not have any opinion as to her mental condition on said October 23.

In the deposition of Barry Wilk, an attorney, he said that he was attorney for testatrix from the summer of 1958 until her death. In October 1958 he represented her in a proceeding to change her name to Lonni Ross. The will was left in his custody about October 1958. On April 6, 1959, he reviewed, with her, her will and the property settlement agreement. In his opinion she had testamentary capacity on that date. At that meeting she said she wanted her property to go as stated in the will. She told him that the will was not to be disclosed until after her death.

In a letter to Mr. Wilk she said: "I don't want my father to know of the will or anything I explained to you because he will interfere."

Dr. Luster, a physician specializing in psychiatry, stated in his declaration (filed by contestants): The testatrix was in psychotherapy with him from September 1954 to May 31, 1957. During that period she was scheduled for psychotherapy four or five times a week. She made many extra visits. The hours he spent with her per month varied from 16 hours to 56 hours—the 56 hours were spent in May 1957. She had suicidal episodes with overdoses of drugs. After July 1957 he did not have any contact with her. During her suicidal episodes he ordered nurses to stay with her on a 24-hour basis. During May 1957 he attended the patient while she was hospitalized. This declaration is made at the request of Mr. Nicholas, attorney for contestants, and the declarant has indicated to the attorney that the psychiatric condition of testatrix was so complex that it is impossible for him to set forth the extent and nature of it in declaration form. During his treatment of her, her judgment was not rational, and in his opinion she did not understand the nature of her acts.

Mrs. Henrietta Ross, mother of the testatrix, stated in her declaration: Testatrix committed suicide in Germany on August 23, 1959. She had attempted suicide on 11 occasions from 1954 through 1957 by taking overdoses of barbiturates. Seven of the attempts were in 1957. Thereafter she had attempted suicide. From 1952 the testatrix was addicted to barbiturates and was under constant medical care. From 1952 to 1957 she was in nine hospitals as a result of her suicidal intent and

addiction. After the massive overdose in May 1957 she became more irrational and her reactions became worse. In 1957 she refused voluntary confinement in a psychiatric hospital in Pasadena. Declarant took testatrix to a clinic at Topeka for treatment, but while they were at a hotel waiting for an appointment testatrix took an overdose of tablets, and the clinic refused to accept her. After May 1957 testatrix suffered several epileptic seizures. When the will was made, the testatrix was three months pregnant, but she made no mention of the baby. Prior to execution of the will, she indicated to declarant that she desired to keep the baby. On October 23, 1957, she did not have testamentary capacity in that she was under the influence of barbiturates the day before executing the will. She was emotionally disturbed to an extent that she did not know the nature of her act nor understand the disposition of her property. Any documents which Hamilton Ross or his accountant had the testatrix sign in 1957, 1958, and 1959, were for the purpose of protecting her against her irrational acts, and for the purpose of permitting Mr. Ross and declarant to provide for her as they had provided during her lifetime. All the property which the testatrix owned was given to her by her parents.

On November 27, 1959, about two months after the will was admitted to probate, Hamilton Ross presented to the executor a creditor's claim wherein the Hamilton Ross Investments (a partnership composed of the parents) sought repayment of a secured loan of $28,392.08. The claim was allowed for that principal amount but was rejected for any amount in excess thereof, and it was to be payable as set forth in the agreement of March 28, 1958, which was made by the testatrix, her parents, and Jack Temkin. About three weeks after the claim was allowed, the petition to revoke the probate of will was filed.

The executor filed his first account and report on June 14, 1960. Hamilton Ross objected to the account, with respect to the method by which the partnership claim was to be paid (i.e., to be paid according to the agreement). In his objections (made in affidavit form about four months after filing the contest), he stated that the testatrix, in pursuance of her obligations under the agreement, had transferred to Jack Temkin, as trustee, three capital units of Pratney Associates to be held in trust for her benefit, and she had given Temkin a power of attorney empowering him to sell her unimproved

real property. He also said that the power of attorney was valid until terminated by her death.

This is a contest after the will was admitted to probate. Such a contest may be made within six months after probate (Prob. Code, § 380)—the will herein was admitted to probate on September 22, 1959, and the contest was filed on March 17, 1960 (5 months, 25 days after probate). ▪ The admission of the will to probate established prima facie for the purposes of the contest that the testatrix was competent to make the will. (*Estate of Baird*, 176 Cal. 381, 383-384 [168 P. 561].)

▪ A testator has testamentary capacity if, at the time of making his will, he understands the nature of the act of making a will, the nature and situation of his property, and his relationship to the persons who have claims upon his bounty and will be affected by the will. (*Estate of Smith*, 200 Cal. 152, 158 [252 P. 235]; *Estate of Lingenfelter*, 38 Cal.2d 571 [241 P.2d 990].)

▪ The declaration of the attorney who prepared the will and witnessed it, and the declaration of the attorney's secretary who witnessed the will, constituted strong evidence that at the time of making the will the testatrix had testamentary capacity. ▪ The list of property made by the attorney (in his notes) while he was interviewing the testatrix regarding the will, when considered in connection with other evidence and the executor's account, indicates that the testatrix understood the nature and situation of her property. (The notes listed property as follows: Real property—$36,000. Pratney [capital units in Pratney Associates]—$36,000. Total $72,000 less obligations of $36,000. TDS [trust deeds]—$13,-168.60. Various obligations [specifically mentioned with detailed amounts] totaling $5,955. Bank accounts—checking, in City National Bank—$600. Savings Account [writing appears to be "Perpetual"] — $3,500. Car. Jewelry. Apartment 9856½ Vidor Street [where she lived and owned her apartment]. The notes also stated names and addresses of beneficiaries, and amounts or kinds of property to be given.)

The executor's first account, filed June 14, 1960, shows that assets of the estate included: Real property (unimproved)— value $40,000. Real property (apartment where she lived)— $11,000. Shares of Kratter Corporation—$45,000 (the Pratney units listed in the attorney's notes at $36,000 had been converted into Kratter shares). Furniture and jewelry. The notes also included a reference to her unborn child—the legi-

ble part of the notes with respect to this is: "Intention to disinherit any child. . . . When E. G. [Elaine Garber—former name of testatrix] has delivered her child we will discuss this again."

It is to be noted also that the contestants had transactions with their daughter in March 1958 (about 5 months after the will was made), whereby she made an agreement with them (under their partnership name) with respect to giving them security for her obligations to them. Another part of those transactions was that, pursuant to the agreement, she transferred to Jack Temkin, as trustee, the Pratney units, and she also gave him a power of attorney to sell her unimproved real property. These transactions, wherein the contestants obtained security benefits, were of some significance regarding their belief as to the daughter's competency. It is also of similar significance that, in the objections to the executor's account, the father (speaking for the partnership) asserted that the power of attorney was valid during the daughter's lifetime.

The deposition of Mr. Wilk, the attorney who reviewed the will with testatrix in April 1959, indicates that testatrix understood the nature of the act of making the will, the nature and situation of her property, and the natural objects of her bounty. At that time, according to his deposition, she reaffirmed the will and she said she did not want the will disclosed during her lifetime. In her letter to Mr. Wilk she said she did not want her father to know about the will.

The evidence on behalf of the contestants, as shown by their depositions and the declaration of Mrs. Ross, was to the effect: That she (testatrix) attempted suicide on many occasions (as above stated), before and after the will was made. She committed suicide. She was addicted to the use of barbiturates, had epileptic fits, took psychiatric treatments for years, may have suffered brain damage from the overdose of barbiturates in May 1957, and was despondent and erratic. She was under the influence of barbiturates on the day before the will was made. She lacked good judgment, made stupid investments, had a joint bank account with Joyce Green, and complained about various things. She traveled alone to Europe in 1957, 1958, and 1959.

Also on behalf of contestants there was the declaration of Dr. Luster, the psychiatrist who treated testatrix prior to July 1957 and has not seen her since that date. It was his

opinion that, during his treatment of her, her judgment was not rational and she did not understand the nature of her acts. Also, there was the first declaration of Dr. Levy, who treated her for five days in May 1957. As stated in that declaration, it was his opinion that she could not know the nature of her acts so as to dispose of her property by will. (In his second declaration, made about a week later, at the request of the executor, he explained that he did not know the meaning of testamentary capacity when he gave his medical opinion in the first declaration; and that he could not say that the condition of testatrix, as he observed it in May, had any necessary relationship to her mental condition on October 23, 1957, and he does not express any opinion as to her mental condition on October 23.)

Appellants (contestants) argue to the effect that the evidence relative to testatrix' addiction to barbiturates was sufficient to present a triable issue of fact. In *Estate of Warner,* 166 Cal.App.2d 677 [333 P.2d 848], where there was a will contest after probate, some of the evidence offered to prove lack of testamentary capacity was that the testator was a chronic alcoholic, was drunk more times than he was sober, was dirty and without motor coordination when drunk, and was many times in alcoholic institutions before and after the will was made. The witnesses to the execution of the will said that the testator exhibited no sign of intoxication when the will was made. A judgment upon directed verdict in favor of the proponents of the will was affirmed on appeal. In that case it was said at page 684: ''It takes more than 'mere guesswork and general conjecture' to support a finding contrary to the presumption that a testator is competent. [Citation.] Evidence, as in the instant action, that testator was a 'chronic alcoholic,' that he has been drunk on various occasions, and that he has taken several 'cures,' some of which consisted of bed rest, massive doses of vitamins, and food, does not tend to prove testamentary incompetence unless it is also proved that the time of decedent's drunkenness coincided with the time of his execution of the testamentary document.''

In *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25], in a will contest before probate, there was evidence that the testator was a chronic alcoholic, was drunk most of the time, suffered numerous attacks of delirium tremens which lasted several hours, was hospitalized for delirium tremens, was irrational, and not capable of taking care of his business. Also, in the opinion of three physicians the testator was of unsound mind

when he made the will. The verdict was that the testator lacked testamentary capacity. The trial judge granted proponent's motion for judgment notwithstanding the verdict. In affirming the judgment, the court said (p. 588): "Absolutely no showing was made that the testator at the time of executing his will was not in the possession of sufficient mental capacity to understand the nature of his act, the extent and character of his property, and the relationship to persons who were the natural objects of his bounty."

"[P]roof of the unsoundness of mind of a testator and of the facts upon which his state of mind depends is not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time the will was executed." (*Estate of Frank*, 102 Cal.App.2d 126, 130 [226 P.2d 767].) In the case just cited, the will was made about 10 days before the testator's death and while he was hospitalized during the terminal stages of cancer. He had been in the hospital about three months before the will was made and there was evidence that by reason of the disease it was difficult for him to speak above a whisper and his speech was so unintelligible that it was difficult to understand him. There was other evidence regarding his physical disabilities. In that case it was stated (p. 130) that it "cannot be said that the testimony of contestant's witnesses did not indicate decedent's mental condition at the time of the execution of the will." Even though such testimony as to mental status before and after the execution of a will is admissible, it does not necessarily follow that a triable issue of fact is presented. In any event, a question finally arises as to whether, under the circumstances of the particular case, such testimony, as a matter of law, has a reasonable tendency to indicate mental condition at the time of executing the will.

Evidence as to "suicide is relevant upon the question of sanity, but standing alone it is insufficient to show an insanity so complete as to destroy testamentary capacity." (*Estate of Lingenfelter*, 38 Cal.2d 571, 581 [241 P.2d 990].)

In *Estate of Goddard*, 164 Cal.App.2d 152 [330 P. 399], which was a contest after probate, there was a summary judgment against the contestants. In that case it was said (p. 158): "Liberally construed, the affidavits on behalf of the appellants

[contestants] fail to reveal any fact or facts from which it could be inferred that the testatrix, when executing her will, did not understand the nature of her act or that she was not cognizant of the nature and situation of her property or her relation to those having claims upon her bounty.'' It was also said therein (pp. 159 and 160) that the contestants, ''in order to defeat respondents' motion for a summary judgment, were required to present an affidavit or affidavits setting forth evidentiary facts sufficient, if accepted as true, to justify setting aside the probate of the will.''

In the present case, it cannot be said that the asserted evidence as to lack of testamentary capacity, submitted by contestants, if accepted as true, was sufficient legally to justify setting aside the probate of the will.

The judgment is affirmed.

Lillie, J., concurred.

Fourt, J., did not participate.